718 P.2d 560
**Sherilyn HUNT, Plaintiff-Respondent,**

**v.**

**Leonard E. HUNT, Defendant-Appellant.**

**No. 15395.**

Court of Appeals of Idaho.

Oct. 16, 1985.

On Denial of Petition for Rehearing
May 19, 1986.

Petition for Review Denied
July 24, 1986.

Michael J. Gaffney, and James G. Reid, of Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Boise, for defendant-appellant.

William J. Hines, and Thomas Brian Dominick, Boise, for plaintiff-respondent.

Before McFADDEN, Acting C.J., and BISTLINE and OLIVER, Acting JJ., Special Panel.

McFADDEN, Acting Chief Judge.

In July of 1980, after approximately thirteen years of marriage, respondent, Sherilyn Hunt, filed for divorce against appellant, Leonard Hunt, based upon irreconcilable differences. On April 30, 1982, Mrs. Hunt moved for partial summary judgment asserting that she was entitled to a five-acre parcel of land in Kuna and a business known as "Mr. Q's" as her sole and separate property. The Magistrate Division granted summary judgment as to the five-acre parcel and denied it as to Mr. Q's.

Prior to trial, on June 1, 1982, the parties orally stipulated that there were grounds for divorce and that all the oral property issues had been settled. The court thereafter granted the divorce and ordered the parties to prepare and submit a written property settlement agreement. Pursuant to the oral agreement, Mr. Hunt took over the management of Mr. Q's.

No written agreement was ever submitted. On August 26, 1982, on motion of Leonard Hunt, the magistrate set aside the oral property settlement. (A final decree of divorce dissolving the marriage but not settling the property rights of the parties was entered on September 30, 1982.) The case went to trial on February 4, 1983, on the property settlement issues. On March 23, 1983, the magistrate court issued a Memorandum Decision and Decree dividing all of the community assets. The magistrate found that Mr. Hunt had conveyed all of his interest in Mr. Q's to Mrs. Hunt and awarded her the business as her separate property. Mr. Hunt appealed to the district court objecting to that award and to the trial court's division of the parties' closely-held corporation "Sheriann, Inc."

Mr. Q's is a Boise bar and restaurant. In 1972 the Hunts leased property on Fairview Avenue and constructed a building in which Mr. Q's is located. In August of that year, the Hunts applied for a State of Idaho Retail Liquor License which they ultimately received in 1975. That license was then used at Mr. Q's and remains in use there at this time. Mr. Q's opened for business in early 1973. In late 1973 the Hunts separated and Mrs. Hunt moved to California. At trial Mrs. Hunt testified that in late 1973 or early 1974, in an attempt to preserve their marriage, Mr. Hunt agreed to give her all of his interest in Mr. Q's. Relying on a written document, signed by Mr. Hunt, purporting to assign all his interest in Mr. Q's to her,[1] Mrs.

---

1. The document reads as follows:
  "ASSIGNMENT
  "I, Leonard E. Hunt do hereby assign all of the interest in a Pub called "Mr. Q's", located at 5790 Fairview, Boise, Idaho, to Sherilyn Hunt.
  /ss/ _____
    "Leonard E. Hunt"

Hunt moved back to the Boise area and took over the management of Mr. Q's. Mr. Hunt denied making any oral agreement with Mrs. Hunt transferring his interest in Mr. Q's and also denied signing the written assignment.

Sheriann, Inc. was incorporated in 1975 with three named shareholders: Leonard Hunt, Sherilyn Hunt and Dennis Sallaz, a Boise attorney. The corporation was used to carry on various businesses of the community, including house construction in California and the management of several properties in Boise. At the time of trial, the corporation's assets included two notes totaling $23,050. The magistrate court concluded that the two shares of stock owned by the Hunts in Sheriann, Inc. were community property and awarded one share to each of the parties. The court also awarded to Mr. Hunt, as part of his share of the community assets, the two notes held by Sheriann, Inc.

On appeal to the district court Mr. Hunt contended that the written assignment was legally insufficient to transfer any interest in the lease to the property on which Mr. Q's was located to Mrs. Hunt. He further contended that the assignment was insufficient to transfer the liquor license used at Mr. Q's to Mrs. Hunt. In regard to Sheriann, Inc., he asserted that the trial court incorrectly charged him with the value of the two notes due Sheriann as part of his share of the community. The district court held that Mr. Hunt had failed to raise any of these issues before the trial court and, citing the rule that issues not raised and considered below will not be considered for the first time on appeal, declined to consider the contentions. It is from that decision that the present appeal is taken.

On appeal to this Court, Mr. Hunt asserts that the issues raised before the district court were also raised at trial and, thus, that the district court erred in declining to address those issues on appeal. Furthermore, he asserts that even if the issues were not raised before the trial court, they should nevertheless have been considered on appeal.

As noted above, Mr. Hunt raised three issues before the district court: the sufficiency of the written assignment to transfer his interest, first, in the lease and, second, in the liquor license, and the appropriateness of the trial court's division of Sheriann, Inc. We will address each issue in turn.

### I.

Mr. Hunt first contends that the written assignment was legally insufficient to transfer his interest in the lease on the property occupied by Mr. Q's. Specifically, he alleges that the assignment was ineffective because it was not signed by Mrs. Hunt and because it was not acknowledged. Initially, we note that our examination of the record in this case supports the district court's determination that the issue of the validity of the assignment to transfer the lease was not raised before the trial court. At trial, Mr. Hunt simply contended that he had not signed the assignment document. The only place in the record where the issue of the validity of the assignment to transfer the lease was discussed was in Mrs. Hunt's brief in support of her motion for summary judgment. Mr. Hunt never responded to those arguments. However, even assuming that the issue was raised, we conclude that the written assignment was legally sufficient to transfer appellant's interest in the lease.

Although a husband and wife may elect at any time to change their property rights, Mr. Hunt is correct in his contention that certain formalities must generally be met. *Stockdale v. Stockdale,* 102 Idaho 870, 643 P.2d 82 (Ct.App.1982). The separate or community nature of real property may be changed in the manner provided for by statute. *Id.* at 873, 643 P.2d at 85. I.C. § 32–906(2) provides that "[p]roperty conveyed by one spouse to the other shall be presumed to be the sole and separate estate of the grantee and only the grantor spouse need execute and acknowledge the deed or other instrument of conveyance...."

The magistrate court specifically found that the written assignment was signed by Mr. Hunt.

"Mr. Hunt testified that he never agreed to convey his interest in Mr. Q's and he further denied that it was his signature on Plaintiff's Exhibit #3 [the written assignment]. A handwriting expert called by the plaintiff, however, testified that the signature was Mr. Hunt's.... Based on the testimony presented the Court is convinced that the defendant did sign the document which conveyed all of his interest in Mr. Q's to the plaintiff."

Mr. Hunt contends, however, that the statute must be interpreted to require subscription by both the grantor and the grantee. He cites the *Stockdale* case, *supra*, for the proposition that conveyances between spouses must be made with the same formalities as required for transfers of real property in general. Appellant contends that I.C. § 9-505[2] is controlling in this case. Although I.C. § 9-505 only speaks to subscription by the party to be charged, he urges that under the case law interpreting § 9-505 both parties must sign the document before it is enforceable.

Appellant's argument fails for two reasons. First, I.C. § 9-505 is inapplicable in the present case. I.C. § 9-505 applies to agreements for the leasing of real property not to the assignment of an existing lease agreement. The applicable section is I.C. § 9-503.[3] Second, even if § 9-505 were applicable, the case law interpreting that section only requires the signature of both parties where the agreement is bilateral. In interpreting § 9-505, our Supreme Court has stated:

"The words 'the party charged' mean the party chargeable with performing some act stipulated in the agreement. That may be only one of the parties to the agreement, or it may be both the parties to the agreement.... [A] unilateral agreement would only require the signature of *the* party which would be only one party, while a bilateral or mutual agreement will require reciprocal duties and obligations to be performed." *Houser v. Hobart*, 22 Idaho 735, 747, 127 P. 997, 1001 (1912), *reaffirmed in C. Forsman Real Estate Company v. Hatch*, 97 Idaho 511, 515, 547 P.2d 1116, 1120 (1976). (Emphasis in original).

The assignment document in this case was clearly unilateral. Mrs. Hunt was not required to perform any duties or obligations and, thus, her signature was not required.

Similarly, we conclude that the lack of an acknowledgement did not render the assignment ineffective to transfer the lease. The purpose of an acknowledgement is to allow an instrument to be recorded. I.C. § 55-805. A recorded conveyance which is not acknowledged does not provide constructive notice to subsequent purchasers and mortgagees. *Harris v. Reed*, 21 Idaho 364, 121 P. 780 (1912). However, the lack of an acknowledgement does not affect a document's validity as between the parties. *See Mollendorf v. Derry*, 95 Idaho 1, 4, 501 P.2d 199, 202 (1972). *See generally* W. Burby, Real Property § 118, at 287 (3rd Ed.1965).

2. I.C. § 9-505 reads in pertinent part as follows:
 "**9-505. Certain agreements to be in writing.**—In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents:
 "....
 "5. An agreement for the leasing, for a longer period than one (1) year, or for the sale, of real property, or of an interest therein, and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent be in writing, subscribed by the party sought to be charged."

3. I.C. § 9-503 reads as follows:
 "**9-503. Transfers of real property to be in writing.**—No estate or interest in real property, other than for leases for a term not exceeding one (1) year, nor any trust or power over or concerning it, or in any manner relating thereto, can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing."

Thus, the fact that the assignment was not acknowledged did not render it ineffective as between the parties themselves.

## II.

Mr. Hunt next asserts that the assignment was ineffective to transfer his interest in the liquor license. He contends on appeal that the liquor license was his separate property. His position appears to be that since the liquor license was not issued until 1975, it could not have been included in the 1974 assignment. We note, however, that the liquor license was applied for and the deposit paid in 1972, two years before the assignment. We also note, as did the district court, the Mr. Hunt's position on appeal is entirely inconsistent with his position at trial. At trial, he contended that the liquor license was an asset of Mr. Q's and, as such, was community property. At no time did appellant ever assert that the liquor license was his separate property. We agree with the district court that as Mr. Hunt failed to make this argument at trial, he is precluded from raising it for the first time on appeal. *See, e.g., Baldners v. Bennett's, Inc.*, 103 Idaho 458, 649 P.2d 1214 (1982).

## III.

Finally, Mr. Hunt objects to the trial court's division of the stock and assets of Sheriann, Inc. The trial court awarded each of the parties one share of stock in the corporation. In addition, the court awarded Mr. Hunt two notes, which appear from the record to have been the principal assets of the corporation, as part of his share of the community property. Mr. Hunt objects to what he terms "a double division of one asset." He contends that the notes were the only corporate assets and that by awarding them to him and also dividing the corporate stock, the trial court in effect awarded the same assets twice.

We are unable to see how Mr. Hunt was prejudiced in any way by the trial court's division of the assets of Sheriann, Inc.[4] Even assuming that the two notes awarded to Mr. Hunt were the only assets of the corporation, Mr. Hunt has failed to show any prejudice resulting therefrom. Mr. Hunt received the two notes valued at $23,050. In addition, he was awarded one of the three shares of stock in Sheriann, Inc., as was Mrs. Hunt. The shares were assigned a value of $11,500 and each party was credited with that amount. Whether the shares were in fact worth less than $11,500, or worth nothing at all, is irrelevant. Because each party was credited with receiving the identical amount, the transaction was a "wash."[5]

The decision of the trial court is affirmed.

Costs to respondent.

No attorney fees on appeal.

OLIVER, Acting J., concurs.

BISTLINE, Justice, dissenting.

The parties were married in April of 1970. When the plaintiff's wife filed this action in July of 1980, her complaint made no contention that certain property acquired coverture had become her sole and separate by reason of gift transfers from the defendant husband. Her prayer for relief asked for a no-fault divorce and an equal division of the real and personal property—community property—and the only property mentioned.

Almost two years later the wife moved for a summary judgment *awarding* her Mr. Q's as her sole and separate property. The motion had attached to it the assignment relied upon assertedly bearing the husband's signature. A supporting affidavit alleged that the undated, unwitnessed, unacknowledged assignment together with a deed to a five-acre parcel were given to

---

4. If the third shareholder, who is not a party to this action, is dissatisfied with this division, he is free to take appropriate legal action.

5. We note that since oral argument in the case at bar, this Court has decided *Sherry v. Sherry,* 108 Idaho 645, 701 P.2d 265 (Ct.App., 1985). It is our determination that *Sherry* is inapplicable to the facts of the present case.

her as an inducement to get her to return to him in 1973 in a period of estrangement:

## WIFE'S AFFIDAVIT

2. That prior to 1973, the Defendant and I had acquired a business known as Mr. Q's and a five-acre parcel of land in Kuna, Idaho. In 1973, the Defendant and I separated as he had filed for a divorce and division of the community property at that time. He changed his mind and wanted me to return to him, (I had returned to California where my family resided and *in an effort to get me to do so, Leonard Hunt gave to me as a gift a Quitclaim Deed to the five-acre parcel of property in Kuna, Idaho,* which has been attached to the Motion as Exhibit "1". At approximately the same time, *and for the same reasons, the Defendant gave to me* (in fact, he handed it to me personally) *the assignment* attached hereto as Exhibit "2". The Defendant told me at that time that he was assigning to me all of his interest in Mr. Q's.

R., pp. 11–12 (emphasis added).

In addition to attaching a photocopy of the assignment to the motion, the wife also attached a photocopy of the deed to the Kuna property. Standing in stark contrast to the assignment (the description therein being only the street address), the quit claim deed to the Kuna property is on a printed form, and shows that the husband on the same date, May 24, 1974, acknowledged his execution of the same before a notary public. The Kuna property deed, however, was not filed for record until the 2nd day of April, 1982.

A responsive affidavit filed by the husband contained these statements as to the Kuna deed and the Mr. Q's assignment:

## HUSBAND'S AFFIDAVIT

3. That, in 1973 Sheri and I separated and she moved to California. Subsequent to the separation Sheri asked that she be made a full partner in all community assets, which I was willing to do and

this was the basis of our reconciliation at that time. At no time did I ever agree to transfer any property, let alone property which was constructed with funds from sales I had made prior to marriage, to Sheri as her sole and separate property.

4. That, the assignment purports to contain my signature, however, at the time it was showed to me in a deposition the typewritten portions of the assignment were not disclosed to me and I could only conclude that the signature looked like mine, however, I could not identify it as such and when the remainder of the document was shown to me it became evident to me that I had not, in fact, signed that document. In addition, I note that the document does not contain any date, nor was my purported signature ever notarized.

5. In addition, I can affirmatively state that I never have filed a gift tax return showing that I gave all of my interest in Mr. Q's to anyone, particularly Sheri.

. . . .

7. The document that purports to be a quitclaim deed, although apparently signed in 1974 by myself, was not recorded until 1982. During these intervening years Sheri and I did reconcile our differences and lived together as man and wife until approximately 1979, and I do not have any present recollection of the quitclaim deed referred to as Exhibit 1, other than I may have signed the same as part of a property settlement negotiation in a prior divorce, but once having reconciled and having lived together as man and wife subsequent to that signing date, I believe that any signature, or any attempted grant on my part, would be nullified. This is also true for any purported assignment, even if made of my interest in Mr. Q's.

8. The only agreement that I had made with Sheri subsequent to 1973 upon reconciliation, was that she would become a part of all of my property, whether it was community or separate, but I did not intend then or now that she would obtain properties that we had ac-

quired during marriage or that I had used premarriage for as her sole and separate property.

R., pp. 24–25.

A supplemental affidavit filed by the husband included this:

4. In addition, since the supposed transfers by me of my interest in the five acres and Mr. Q's to Sherilyn, she has as well as myself on numerous occasions since 1974 applied for loans, filed income tax returns, given financial statements to lending institutions, executed notes, and pledged security interest in the assets she is claiming at this point to be her separate property in both her and my name and has admitted to lenders and creditors, that she and I together own the 5-acre parcel of land in Kuna, as well as Mr. Q's.

4. [sic] In her most recent tax return which is for the year 1981, she continues to depreciate the assets of Mr. Q's together with me jointly, thus controverting any statement she may make to the effect that she may make indicating that Mr. Q's is her sole and separate property as opposed to being the joint property of both of us.

R., p. 28.

When the motion for summary judgment came on to be heard, the court and counsel for both parties made a strange departure from summary judgment procedure: [1]

(Beginning of hearing held
May 20, 1982)

THE COURT: OK, this is the case of Sherilyn Hunt vs. Leonard Hunt, Case No. 72286. There's a motion for summary judgment by the Plaintiff. That motion requests that the Plaintiff be awarded a certain asset known as Mr. Q's, a business enterprise. The second part of that motion is that the Plaintiff be awarded a certain parcel of land, as I recall from the affidavit of approximately five acres near the city of Kuna, Ida-

ho. The second part of this hearing today is the Defendant's Order to Show Cause to the Plaintiff, to show cause why the Plaintiff should not pay to the Defendant ... the sum of $1,250.00 per week as a community share of assets—community share of profit in the business known as Mr. Q's. Mr. William Hines represents the Plaintiff, and Mr. James Reid represents the Defendant. Mr. Hines, are you ready to proceed today?

MR. HINES: Yes, I am, Your Honor.

THE COURT: Mr. Reid, are you also ready to proceed?

MR. REID: We are, Your Honor.

THE COURT: Let's take up the motion for summary judgment first, gentlemen. Mr. Hines, did you wish to make any argument on this?

MR. HINES: ... Yes, just briefly, and actually, Your Honor, I think because of the nature of both motions and I intended to put my client on, I'll have her testify regarding both issues while she's on the stand if that would be alright with the Court.

THE COURT: OK, do you want to present testimony on your motion for summary judgment, rather.....

MR. HINES: Yes.

THE COURT: ..... than just stand on the affidavits?

MR. HINES: Yes.

THE COURT: OK.

MR. REID: We had also, Your Honor, filed a Notice of Intent to Cross-examine as it's not on our affidavits, so......

THE COURT: OK, Mrs. Hunt, .....

MR. REID: ..... I think that would be the logical way to go. We can have her take the stand first.

THE COURT: Certainly. Mrs. Hunt, would you step forward, please; you'll have to raise your right hand and be sworn?

1. Under the provisions of I.R.C.P. 56(b)(c)(e), the motion is restricted to the pleadings, depositions, answers to interrogatories and admissions on file. The taking of live testimony which is conflicting and contradictory would seem to *per se* belie the requisite absence of genuine material fact—for which reason the rule does not permit the taking of live testimony.

**656**

(SHERILYN HUNT, was sworn)

THE COURT: Have a seat up here behind the microphone, please.

Tr., pp. 1–2.

The wife testified first and extensive examination of her by both counsel consumed 68 pages of reporter's transcript. The examination of the husband consumed 31 pages of transcript. Ten exhibits were marked and either admitted or referred to, four by the wife and six by the husband.

It was not the ordinary summary judgment proceeding. In my view, it was not at all a summary judgment proceeding, but rather a trial on the merits as to the status of the ownership of Mr. Q's and the Kuna five acres. With both witnesses giving conflicting evidence, and with considerable impeaching evidence being elicited by prior remarks and documentary evidence—all being a live trial in front of the magistrate— the court and counsel should have realized that actual ownership of the two parcels presented two genuine material issues of fact, and credibility was very much at stake.

After the trial was concluded, the court allowed counsel to argue. The wife's attorney was first. As pertinent to the wife's claim of both properties as two gifts, he recognized some problems with her case:

The only thing that they've shown is that there were tax returns and loan applications filed, as admitted by the Plaintiff, which listed both of them as the owners. First taking loan applications, my experience has been that loan applications are not the most valid proof of anything, of neither value nor of ownership. As far as the tax returns, I don't know what they show other than that on the tax returns it listed both their names. It didn't mean anything to the Plaintiff. It never changed her perception of the property and, in fact, it like all of the other documents introduced, don't really show anything. All they show is that some documents were filed. They don't show anything concerning what the facts of the case were. They certainly don't show that the assignment wasn't given.

They certainly don't show that the Quitclaim wasn't transferred. And for those reasons we're moving to have this Court declare that those two items of property are separate property, and this would include the liquor license and other property include therein. I think the testimony has shown that the application for liquor license was long before the assignment, and there wasn't any further steps done once that application was made to get that liquor license.

Tr., pp. 107–08.

The husband's attorney in response saw the conflict of evidence in a stronger light. In part he said:

MR. REID: No, I think I can make this one pretty short, because one of the basic factors that I think Mr. Hines totally overlooks here is this is not the trial in this case. This is a motion for summary judgment. In his motion for summary judgment he says there are no genuine issues of material fact. *All we have been talking about since 9:00 this morning is issues of material fact, and I think we've amply shown that putting aside whether the Court believes, disbelieves, that's not the test in a summary judgment proceeding.* This is not the trial. But putting all that aside and getting right to the merits of the argument, his client on the witness stand says that they separated in 1973; that they reconciled in 1973, and in fact, they have Grant Deeds as part of the reconciliation that we concede to. When Mr. Hunt did by Grant Deed, deed some property in California that he held prior to marriage; that he'd bought prior to marriage to the marriage as a joint community. All this was in 1973. Now, magically in May of 1974, not only do we have Leonard Hunt giving away Idaho property to her separately, we've got him giving away the business. A business that last year in 1981 by Mrs. Hunt's own statements, grossed $393,000.00, that is a tremendous reconciliation; I've got to admit that. Not only do you get to talk somebody into giving you everything they had

before they were married; now they've got to give you what they acquired after marriage as your sole and separate property to stay married. Look at the doc— he says there's no documents that contradict; I asked Mr. Hines to look at his own verified Complaint that his law partner filed in this case. All that Complaint says is that during the course of the marriage personal and real property were acquired and we want an equal distribution. Nowhere does that Complaint mention that separate property was acquired by Mrs. Hunt during the course of the marriage. Nowhere in that Complaint does it say that sep—this all came about since we've been getting close to trial. I find that at least curious. In her deposition I asked her, on the 16th of March of this year, "The next item is Mr. Q's. Tell me what Mr. Q's is." Answer, "Restaurant and lounge." "That's on Fairview?" Affirmative nod. "And do you and your husband own Mr. Q's as individuals, or is that through a corporation?" Answer, "Individuals." All of a sudden this document that was put in front of the Court that purports to be an assignment of some interest, that is not dated, that she says was done in 1974 as part of a reconciliation proceeding, even though she now admits they reconciled in 1973 as the Grant Deeds show—this undated document has conveniently been lost, unavailable until all of a sudden, bang, 1982; now, we find it. We find it when we're getting ready to go to trial. This Grant Deed—I mean, excuse me, the Quitclaim Deed that they're talking about here that he transferred supposedly the five-acre parcel of land in 1974, I would ask Your Honor to look at the date that that deed was recorded, and who recorded it. Her attorney records it here a month ago, 1982. Somebody deeds—now her explanation, by the way, for this five-acre parcel and this quitclaim Deed is, "Well, for financial reasons Leonard would say, 'Don't record this.'" If the Deed of Trust that they took out together to secure a loan on that identical piece of property in 1975,

almost a year after the reconciliation, was recorded, why would Leonard tell her not record one do record the other if the recording is on it? That doesn't make any sense. He says the documents that we've submitted don't tend to show anything. *I submit to Your Honor, we have totally impeached her statements concerning the separateness of this property.* She goes to banks, she signs loan applications listing him as co-owner of the property. This is 1980, this is just less than two years ago. In 1981, I asked her about a $1,500.00 loan obtained from the bank and showed her a loan document, and she says, "I don't ever recall that." Well, the trial in this matter is Tuesday and we'll have the bank assistant manager, Mr. Baker, in here Tuesday to testify as to that. That's one of the pieces of evidence we are allowed to put in at trial. Tax returns have been filed jointly all along, depreciating the assets of Mr. Q's equally with both of them. Why? I think that—we get to—we're entitled to a few presumptions here. *Every document that has been filed, every transaction that has been incurred on behalf of Mr. Q's since 1974 indicates joint or community ownership.* There's only one document that doesn't, and that's that little sentence and a half assignment that's not even dated. And based on that, she's got the audacity to set here and say they're entitled to summary judgment. I can't comment anymore on that because as a Federal Court Judge recently said, their argument itself is enough to defeat its own contentions. The five-acre parcel of land, there was a deed. He says—Mr. Hines says that, "Well, because I've shown you a Quitclaim Deed that's signed and supposedly has a notarization on it, the Court has to place great credence in that." But if the Defendant shows you a writing that tends to contradict that intent, you can't put too much credence in what he shows you. I fail to understand why one document has to have more credence than another. The point is this—given this is

a summary judgment motion, this is not a moti—this is not a closing argument, a trial motion. *There has to appear to the Court in order for any summary judgment to be granted, as Counsel has stated in his motion, no genuine issue of fact. For four-and-a-half hours today we've been talking about fact issues, credibility issues.* If this is your separate property, why did you do this? Why did you go to a bank with a loan application and place your husband down as a co-owner? Why did you depreciate Mr. Q's—the assets Mr. Q's all along? She admitted on the witness stand that Leonard worked with her after 1974 and '75 in Mr. Q's. He said it was more than that. They've been separated since 1979, but that doesn't—that is not evidence one way or another of the separateness of the property. Mr. Hunt said he didn't recall signing that assignment. Mr. Hines challenges this by saying, "Well, you can't deny it." I think I heard that two or three times. I'll be real honest with you, Your Honor, I don't recall a lot of things I did last week, but I couldn't sit and say I didn't do them either. I don't have a—unfortunately, I guess I can apologize to Mr. Hines, I don't have twenty-twenty hindsight that is one hundred percent perfect. Maybe his client does. We're talking about transactions that took place in 1974 and '75. Mr. Hunt was being, in my opinion, honest when he says he—the reason he doesn't recall it is because it never happened. He was asked if he thought that signature was his signature, or if he had any reason to believe that it wasn't, and he said, yes, he did have a reason to believe it wasn't; that another document which will be....

.... [Objection—overruled.]

MR. REID: He said in another document that he felt his signature wa— wasn't his signature had been shown to him recently and now he questions all these—both these, and that is his basis and it's a logical basis. I don't know what more we can say but saying we don't recall these things. As far as the Order to Show Cause, the Order to Show Cause is directed that the Plaintiff show cause why he shouldn't be receiving his fair share of the profits.

Tr., pp. 110–14 (emphasis added)

On that state of the record, the magistrate court made its ruling:

THE COURT: OK, gentlemen, this case is set for trial Tuesday morning. *Ordinarily on these summary judgment like this I take them under advisement,* but if did that it wouldn't— there'd be no need to have the summary judgment today. *I'm going to go ahead and make a decision on this from the bench here today* on these—the motion for summary by the Plaintiff and the Order to Show Cause. Listening to the testimony, I think Mr. Reid has stated this correctly in this sense that this is a motion for summary judgment, taking that one up first, and not the trial of the matter and, therefore, if I feel that there has been a genuine issue of material fact that's been presented, then there is no summary judgment granted. If there is no material issue of fact, and then the second test is met that the moving party is entitled to judgment as a matter of law, then summary judgment could be entered. Taking up first the issue of the property known as Mr. Q's on Fairview Avenue, Mr. Hines, I will deny that part of the motion for summary judgment. I will make no findings of fact at this time; simply state that I believe that there is a material issue of fact based on Mr. Hunt's testimony. I do feel like that this assignment is persuasive evidence of a gift, but it has to be no genuine issue of any material fact, and I don't think that the assignment gets us to that point in this proceeding. I would suspect that a handwriting expert could tell whether or not the signature on the assignment is Mr. Hunt's. I'm not a handwriting expert, but they all sure look the same to me, but I assume that a handwriting expert would be able to tell. *On the second part of the motion for summary judgment on the parcel of land in*

*Kuna,* Idaho, Mr. Hines, *I will grant that motion* for summary judgment. I do believe that the Quitclaim Deed that is notarized; that Mr. Leonard Hunt signed that document and granted to Sherilyn Hunt and as it states in the deed, as her sole and separate property; that that is an effective transfer of separate property, or at least of whatever community interest he might have in that property to Sherilyn Hunt as her sole and separate property. *And the fact that it wasn't recorded until last month doesn't have anything to do with it.* Mr. Hines, you're correct with the Stockdale case and I believe it's the Griffith case or Griffin case, I'm not sure as to which one it is that came out with the Stockdale case, states that all there has to be for transmutation—well, states the requirements for transmutation. There has to be a document that satisfies the requirements of a transfer of real estate, and the Quitclaim Deed sure satisfies that requirement. *I don't think there's a material issue of fact on the parcel of land in Kuna,* and that as a matter of law, the Plaintiff is entitled to judgment on that point.

Tr., pp. 117–19 (emphasis added).

A written ORDER AND JUDGMENT was entered:

THIS MATTER Having come before the Court on the 20th day of May, 1982, pursuant to the Plaintiff Sherilyn Hunt's Motion for Summary Judgment and the Defendant Leonard E. Hunt's Motion for Order to Show Cause, and both parties appearing in Court through their counsel of record; both parties presenting testimony and other evidence to the Court and the Court, upon hearing the testimony, reviewing the evidence and the pleadings on file herein; and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. That Summary Judgment shall be denied as to that property identified as the business Mr. Q's.

2. That Judgment is hereby granted to the Plaintiff awarding to her as her sole and separate property the property located at Route # 2, South Cloverdale Road, Kuna, Idaho, and better known as the S. 1/2 of L. 6, Blk. 3, Cloverdale Ridge Estates Subdivision, filed in Plat Book 28 at page 1739, records of Ada County, State of Idaho, as identified in Exhibit "1" attached hereto.

3. That the relief sought in Defendant's Motion for Order to Show Cause is denied at this time.

R., pp. 36–27.

That judgment was not certified as appealable, and no appeal was attempted. That judgment, and its implicit finding that the deed to the Kuna five acres was a completed gift to the wife, would later serve as the trial court's supporting reason for awarding Mr. Q's to the wife as a gift from the husband, as discussed *infra.*

The controversy came on for trial on June 1, 1982. At that time counsel read into the record a stipulation for a complete division of the property. Both husband and wife being present, each in turn took the stand and testified that the division was fair and was accepted. The court wanted it placed in written form, approved by both counsel, and stated it would be signed as soon as submitted.

Later, the court, on the husband's motion, set aside the stipulation and rescheduled the trial, saying that he *found* there was no meeting of the minds on June 1, 1982, and therefore no enforceable agreement. No rationale was given for this ruling.

Thereafter, the case came on for a regular trial, following which the court rendered its decision as to all property—including the Kuna five acres—notwithstanding that it had been awarded to the wife on the summary judgment proceeding! Because my concern is largely with the trial court disposition of the Kuna parcel and the disposition of the business called Mr. Q's, a starting point for any sound analysis is an examination of the *ratio decidendi* which governed the trial court's determina-

tion. After assessing both as community property acquired during coverture, the court proceeded as follows in a memorandum decision which was declared to also serve as the requisite findings of fact and conclusions of law:

The business known as Mr. Q's located on Fairview Avenue, Boise, Idaho, is the major issue between the parties. This business was begun in 1972 as a bar, lounge, and restaurant. It was acquired during the marriage of the parties and is presumed community property. *Idaho Code* 32–906. The burden of proving a separate property interest in the asset is on the party claiming a separate property interest. *Guy v. Guy*, 98 Idaho 205 [560 P.2d 876] (1977).

The plaintiff, Sherilyn Hunt, has alleged that Mr. Q's is her separate property. Her testimony was that the plaintiff and the defendant experienced marital difficulties in 1973 and at that time the defendant orally agreed to give her his interest in the business known as Mr. Q's. She further testified that he later executed a written assignment of all of his interest in the business. *See* Plaintiff's Exhibit # 3. Plaintiff's Exhibit # 3 is an undated document which states "I, Leonard E. Hunt, do hereby assign all of the interest in a pub called 'Mr. Q's', located at 5790 Fairview, Boise, Idaho, to Sherilyn Hunt." This document is titled "assignment" and is signed by Leonard E. Hunt.

Mr. Hunt testified that he never agreed to convey his interest in Mr. Q's and he further denied that it was his signature on Plaintiff's Exhibit # 3. A handwriting expert called by the plaintiff, however, testified that the signature was Mr. Hunt's.

One spouse may convey property to the other and it shall be deemed the sole and separate property of the grantee spouse and only the grantor spouse need execute and acknowledge the deed or other instrument of conveyance. *Idaho Code*, 32–906(a). *Based on the testimony presented the Court is convinced that the defendant did sign the doc-* *ument which conveyed all of his interest in Mr. Q's to the plaintiff.*

Counsel for the defendant correctly argues that not only must the defendant deliver the gift to the grantee spouse, he must also have intended to make such a gift. On this particular point the testimony is in conflict. The defendant has denied that he intended to make a gift of his interest in Mr. Q's; therefore, this is a question of fact which the Court must decide and *the Court specifically finds that the defendant did intend to convey all of his interest in Mr. Q's to the plaintiff.* The plaintiff's testimony was that the defendant was not much interested in managing the bar and corroborates her testimony that he intended to deliver Mr. Q's to her. *In addition, in May, 1974,* about the time that the plaintiff claims the defendant orally gave her his interest in Mr. Q's *the defendant executed a quit claim deed to the plaintiff for a 5 acre lot in Kuna, Idaho. This transfer also corroborates the plaintiff's assertion that the defendant was conveying property to her in an effort to reconcile their marriage.* The business known as Mr. Q's is plaintiff's separate property, and she is entitled to take possession of the business 10 days after the date of this decision.

R., pp. 74–76 (emphasis added).

Notwithstanding the quit claim deed to the Kuna five-acre parcel, the court considered it as community property. On our review following an appeal to the district court, our function is to determine whether or not the trial court erred. With that standard in mind, and without the benefit of any findings of fact specifically stated, *Donnelinger v. Donnelinger*, 107 Idaho 431, 690 P.2d 366 (Ct.App.1984); *Sherry v. Sherry*, 108 Idaho 645, 701 P.2d 265 (Ct.App.1985), we could, perhaps, disregard a lack of findings, but "only if the record is clear and yields an obvious answer to the relevant factual issues." *Donnelinger, supra,* 107 Idaho at 437, 690 P.2d at 372, citing *Pope v. Intermountain Gas Co.,* 103 Idaho 217, 646 P.2d 988 (1982).

It may be noted at the outset that the trial court's memorandum decision is wholly inadequate as findings of fact specifically stated. This Court has recently stated, in October of 1984 to be exact:

> Our holding is not intended merely to facilitate appellate review, although that is a worthy consideration. Specific findings also demonstrate to the parties that the trial court has examined their divorce case—one of the most important emotional and economic events in their lives—with due care and attention to the evidence. Most importantly, the requirement of explicit findings encourages a trial judge to rely upon objectively supportable grounds for his decision, and discourages subjective or attitude-influenced perceptions of the case.

> *Donnelinger, supra,* 107 Idaho at 437, 690 P.2d at 372.

With the precepts of *Donnelinger* and *Sherry* in mind, we search out from the trial court's memorandum decision the few factual findings which can be gleaned therefrom, which are:

> (1) "Based on the testimony presented the court is convinced that the defendant [husband] did sign the document which conveyed all of his interest in Mr. Q's to the plaintiff [wife]."

> (2) "The court specifically finds that the defendant [husband] did intend to convey all of his interest in Mr. Q's to the plaintiff [wife]."

This finding, which I have numbered (2) for easy reference, is in reality an ultimate finding, more often referred to as a conclusion, which goes to the question of whether a gift was made, and in essence was the same as the trial court's eventual holding

only differently stated: "The business known as Mr. Q's *is* plaintiff's separate property...." In support of finding (2) the trial court furnishes us with only this single evidentiary finding:

> (3) "In addition, in May, 1974, about the time that plaintiff [wife] claims the defendant [husband] orally gave her his interest in Mr. Q's the defendant executed a quitclaim deed to the plaintiff for a 5 acre lot in Kuna, Idaho."

The court's reasoning, but not a finding of fact, was thusly stated: "This transfer [Kuna five acres] substantiates the plaintiff's [wife's] assertion that the defendant [husband] was conveying property to her [wife] in an effort to reconcile their marriage." Not only are we confronted with a lack of specific findings, but with reasoning which is faulty on its face. Although the court was relying on the Kuna transfer as corroborative of a donative intent on the part of the husband, internally inconsistent with that hypothesis was the inescapable fact that the court at the same time, reversing his summary judgment, was holding that purported transfer inoperative to make the Kuna five acres the wife's separate property. The court, in the same memorandum decision, in making a division of assets went on to allocate the Kuna five acres to the wife *as community property AWARDED TO PLAINTIFF.* My service on the Supreme Court having convinced me that a picture is indeed worth a thousand words, especially when attempting to enlighten colleagues,[2] I can offer at this juncture nothing superior wordwise to a copy of the pertinent portion of the memorandum decision, which is a continuation of the typed excerpt found above:

> all three judges may not see any occasion to read the transcript which the judge assigned the case has presumably labored through. This is not intended as any criticism, and is to be regarded as a factual report on reality. It would be an easy matter for the maker of rules to provide that on such appeals the party appealing beyond the district court should provide two or four additional copies of the magistrate trial proceedings, depending on whether the case is retained by the Supreme Court or assigned to this court.

---

2. A short-coming in our judicial system is that on this type of appeal—which challenges a magistrate court judgment—the case first goes to a district judge who can have a trial de novo, or act as an appellate court—the latter here being the situation. The district judge ordered the appealing husband to furnish a transcript of the taped magistrate court proceeding. The district judge needing only one transcript, in turn on the appeal to this court, three of us are furnished but one transcript with which to work. Accordingly, it may be readily understood that

There was also testimony that the defendant owned separate property prior to the marriage. The Court finds that the following items are the separate property of the parties and assigns each as follows:

### SEPARATE PROPERTY OF PLAINTIFF

1. The business known as Mr. Q's located on Fairview Avenue, Boise, Idaho, including the liquor license to that business.

### SEPARATE PROPERTY OF DEFENDANT

1. slot machine
2. jewelry box
3. clothing of the defendant
4. .22 caliber ruger pistol
5. oil painting

The remaining items of property acquired by the parties are found by the Court to be community property and the Court is required to assign these assets is such proportion as the Court deems just, and unless there are compelling reasons otherwise, there should be a substantially equal division in value, considering debts, between the parties. *Idaho Code* 32–712. A purely mathematical division, however, is not likely nor is it required. *Shepard v. Shepard*, 94 Idaho 734 [497 P.2d 321] (1972).

### COMMUNITY PROPERTY AWARDED TO PLAINTIFF

| | | |
|---|---|---:|
| 1. | residence in Kuna, Idaho and 23 acres | $85,000 |
| 2. | 5 acres in Kuna, Idaho | 27,500 |
| 3. | one share of Sheriann Inc. | 11,450 |
| 4. | Christensen note | 15,900 |
| 5. | Mark 5 automobile | 5,000 |
| 6. | Furniture in the residence in Kuna | 7,500 |
| 7. | Toyota automobile | 3,500 |
| 8. | IRA account | 1,500 |
| 9. | loan due from Adam's Ribs | 9,000 |

### COMMUNITY PROPERTY AWARDED TO DEFENDANT

| | | |
|---|---|---:|
| 1. | Amy Street property | $37,250 |
| 2. | one-tenth interest in 560 acres in Ca. | 65,000 |
| 3. | one share of stock in Sheriann Inc. | 11,450 |
| 4. | note | 8,450 |
| 5. | note | 14,600 |
| 6. | Pense note | 3,000 |
| 7. | GMC 4 × 4 | 5,000 |
| 8. | 1964 Jaguar automobile | 3,000 |
| 9. | 16' camper | 2,000 |
| 10. | flatbed trailer | 800 |

This division of assets is substantially equal although it is slightly in favor of the plaintiff. The Court has done this to compensate plaintiff for the sum of $14,000.00 that the defendant was ordered to pay plaintiff during the pendency of the case and which the defendant did not pay.

Over and above the magistrate court's erroneous utilization of the deed to the Kuna five acres as evidence of a donative intent on the husband's part, the memorandum opinion is clearly devoid of any discussion of *all* of the requisite elements to proving a valid *in praesenti* gift. Yet the Idaho case law is abundant in this area.

One of the Supreme Court's most recent cases is *Matter of Estate of Lewis*, 97 Idaho 299, 543 P.2d 852 (1975). There that Court relied upon and quoted from *Zimmerman v. Fawkes*, 70 Idaho 389, 219 P.2d 951 (1950), where Chief Justice Taylor, writing for a unanimous Court, set out five essential elements which must be proven before a valid *inter vivos* gift will be found:

> In *Zimmerman v. Fawkes*, this Court enunciated the essential elements which must be present before a valid inter vivos gift will be found to exist:
>
> "* * * The essential elements of a 'gift inter vivos' are: (1) A donor competent to contract; (2) freedom of will of donor; (3) the gift must be complete and nothing left undone; (4) the property must be delivered by the donor and accepted by the donee; (5) the gift

must go into immediate and absolute effect."

*Lewis, supra,* 97 Idaho at 302, 543 P.2d at 855 (footnote omitted).

In that case the first three elements were not in dispute; the contention was that "there was no present delivery because the property did not pass beyond the dominion and control of the donor." *Id.* The Supreme Court responded by perhaps adding yet another element, or by interpreting elements four and five, as per *Zimmerman,* that of a "present donative intent, that is the giver's purpose or motive to transfer immediately to the donee dominion over the object given." *Id.* For that statement the Court cited *Christiansen v. Rumsey,* 91 Idaho 684, 429 P.2d 416 (1967). This latter case, however, while it does contain the same exact statement for which it was used in the *Lewis Estate* case, cites back to *Zimmerman* for the proposition stated. Strangely, *Zimmerman* uses no such language at all, so it obviously was the Supreme Court's interpretation of elements four and five from *Zimmerman.* The *Christiansen* opinion also mentioned, without relying upon, an opinion issued nine months earlier by the Supreme Court, *Boston Insurance Co. v. Beckett,* 91 Idaho 220, 419 P.2d 475 (1966). The opinion in that case primarily relied upon *Zimmerman* and on *Goggins v. Herndon,* 73 Idaho 169, 249 P.2d 203 (1952). In the *Boston Insurance* case the Supreme Court did not mention a donative intent requirement, but spoke more in the language of *Zimmerman,* and mentioned intent only with regard to making a present gift as against an intent to make a gift *in futuro:*

> The requirements necessary for a gift inter vivos are that the donor part with all present and future dominion over the property, which must be delivered to the donee or someone for him. The gift must be absolute and irrevocable without reference to taking effect at some future period. The mere intention to give in the future is insufficient in law. *Goggins v. Herndon,* 73 Idaho 169, 249 P.2d 203; *Zimmerman v. Fawkes,* 70 Idaho 389, 219 P.2d 951; ....

....

> ... There is substantial, competent evidence to support the conclusion that Mrs. Johnson did not have the requisite intent to make a present gift and did not relinquish complete dominion over the subject of the purported gift, but, in fact, her intent was to make a gift in futuro.

> *Boston Insurance, supra,* 91 Idaho at 222–23, 419 P.2d at 477–78.

*Goggins* added nothing to the law of gifts. The Supreme Court merely restated the five elements of *Zimmerman,* adding that essential elements three, four and five were absent. *Goggins, supra,* 73 Idaho at 173, 249 P.2d at 205.

Turning again to *Christiansen,* there is language other than that above set forth which is even stronger.

> Even where the object of gift has been placed in his possession, the donee must establish that its delivery was accompanied by the donor's intention immediately and unconditionally to divest himself of dominion. *Claunch v. Whyte,* 73 Idaho 243, 249 P.2d 915 (1952); *Zimmerman v. Fawkes,* supra.

> *Christiansen, supra,* 91 Idaho at 686, 429 P.2d at 421.

*Claunch* remains to be visited, again a unanimous opinion authored by Chief Justice Taylor. This decision brings into play the additional factor of an alleged gift where the two principals stand in a confidential or fiduciary relationship to each other. The factual background and the legal relationship of the parties there are best taken from the opinion.

> The property in question was the community property of the plaintiff and her deceased husband, William M. Claunch. Defendant Phyllis Whyte is the daughter of the deceased by a prior marriage. The plaintiff and the deceased were married in 1938. At that time Phyllis was thirteen years of age. Phyllis was married to defendant Stanley Whyte in 1946. In the spring of 1947 she and her husband took up residence on land owned by her father. The arrangement was that

she and her husband would operate her father's land and the land in question on a "fifty-fifty basis." That is, the defendants as tenants would receive one-half of the crops and one-half of the proceeds of the livestock. Mr. Claunch died in April, 1948, and the defendants continued to operate the property thereafter on the same basis by agreement with the plaintiff. The Claunches apparently had some interest in oil lands in Texas and, after the death of Mr. Claunch, the plaintiff began planning a trip to Texas in the fall after the harvest. She was in poor health and suffering from a heart condition, which caused her to believe that she might not survive the trip. She testified that her feeling toward Phyllis was as for a daughter; that they had always been on intimate and friendly terms and that she "had all the love in the world for Phyllis." On or about November 4, 1948, she went to an attorney and had a quitclaim deed drawn, purporting to transfer this property to Phyllis. This deed she personally handed to Phyllis, stating at the time, according to her testimony, that if anything happened to her while away she wanted Phyllis to have the property. She packed her clothes in December, intending to leave in January, 1949, after she had paid her income taxes. Sometime in December, while these preparations were being made, she gave Phyllis an instrument in her own handwriting transferring to Phyllis all of her cattle, "in case she did not return" from the trip. Unprecedented winter weather delayed her departure until March. Just before leaving she gave Stanley Whyte permission to sell the "early" cattle during her absence and deposit her share to her account at the bank. This direction was carried out.

After her return from the trip she observed that the attitude of the defendants was cool, and in July Stanley advised her that he was going to quit the operation of the property and go to school in the fall. When fall came the parties settled on the basis agreed upon, and the defendants, having decided to leave the farm, the plaintiff sold all of her cattle and farm machinery. In February, 1950, the defendants moved from the farm to Pocatello, in Bannock County, to accept employment there. Plaintiff paid the taxes on the property for the years 1948, 1949 and 1950. She further testified that she had great confidence in Phyllis and trusted her implicitly.

Mr. J.H. Anderson, an attorney who had practiced his profession in Blackfoot for many years and who prepared the quitclaim deed at plaintiff's request, testified that when she came to his office with the request that he prepare the deed she stated that she had a heart condition and was going away and did not know whether she would ever come back; that she might die and wanted to deed the property to Mrs. Whyte in case she didn't come back; that if she died she wanted Mrs. Whyte to have the property; that he suggested to her that Mrs. Whyte might not give it back, to which she responded, "I trust her" and "she will give it back."

The deed was recorded in February, 1950, after the defendants had moved to Pocatello. The plaintiff testified she first learned of the recording in May, 1950, and that was her first knowledge that the defendants claimed the property. Her complaint herein was filed September 7, 1950.

*Claunch, supra,* 73 Idaho at 245–46, 249 P.2d at 915–16.

The controversy there was between the plaintiff widow and her stepdaughter— which is a far cry from being as close as the relationship which exists between husband and wife. The Supreme Court did not hesitate to reverse the trial court's award of the "gifted" real estate to the stepdaughter. In doing so it merely applied the existing standard for the quantum of proof to establish a gift between parties standing in a fiduciary relationship:

Admitting that there was no consideration for the deed and contending, as she does, that it conveyed the property to her as a gift inter vivos, the defendant, Phyl-

lis Whyte, brings herself within the rule that such gifts are not presumed and the burden is on the beneficiary to establish the gift. *Lo Presti v. Manning*, 125 Cal.App. 442, 13 P.2d 1002; 38 C.J.S., Gifts, § 65. *Where the donee stands in a fiduciary or confidential relationship to the donor the burden is increased to the extent of requiring the beneficiary to establish the gift by clear and convincing evidence.*

" * * * where the gift is to executrices who are shown to be fiduciaries the *burden of proof is upon such donees to clearly and unequivocally prove a gift in the first instance, and to so prove it that there would be no uncertainty as to the intent* (and other requisite concomitants) on the part of the donor nor any question of undue influence exerted by the donee upon or over the donor or advantage taken of the confidential relationship existing between the parties." *In re Estate of Randall*, 64 Idaho 629, at page 640, 132 P.2d 763, 768, 135 P.2d 299.

And in *Blake v. Blake*, 69 Idaho 214, 205 P.2d 495, 498, where the respondents were found to be fiduciaries, it was said:

" * * * the *burden of proof was on respondents to prove a gift or transfer of appellant's one-sixth share in the estate to Mrs. Jessie M. Blake by clear, satisfactory, convincing and unequivocal evidence.*"

Here the plaintiff protested an implicit confidence in Mrs. Whyte and defendants testified that the relationship was friendly and cordial until after they determined to move from the ranch in 1949, and the record shows that in all their dealings the confidence reposed in the defendants by the plaintiff was in all details honored by them with the exception of the deed in question. In *Stearns v. Williams*, 72 Idaho 276, 240 P.2d 833, 840, this court said:

"A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence.

" * * * the confidential relationship which is protected in equity is synonymous with fiduciary relationship, * * it exists whether the relationship is technically fiduciary or merely informal, whenever one trusts in and relies on the other, * * *."

Leaving the key to her home and the bill of sale to her cattle with Phyllis while she was in Texas, and instructions to sell marketable cattle and deposit her share while she was gone, were specific impositions of trust. The grantee stood in a confidential relationship to the grantor. Hence, the finding must be supported by "clear, satisfactory, convincing and unequivocal evidence" that the deed was delivered with the present intention on the part of the grantor to divest herself of the title and transfer it irrevocably to the grantee.

Actual transfer of the possession of the subject of the gift is an important and often controlling factor in establishing the intent of the donor. *Maynard v. Taylor*, 185 Okl. 268, 91 P.2d 649; *Johnson v. Hilliard*, 113 Colo. 548, 160 P.2d 386; *Yarbrough v. Bellamy*, 197 Okl. 493, 172 P.2d 801; *In re Hamilton's Estate*, 26 Wash.2d 363, 174 P.2d 301; *Gulley v. Christian*, 198 Okl. 167, 176 P.2d 812; *Stenwall v. Bergstrom*, 405 Ill. 281, 90 N.E.2d 778; *Cavett v. Pettigrew*, 182 Ark. 806, 32 S.W.2d 808; 129 A.L.R., note 35; 16 Am.Jur., Deed, §§ 132, 133. Here the respondents, being in possession of the property as tenants, continued to attorn to the donor and on their own volition terminated the relationship and relinquished possession of the property before recording the deed or by any other word or act asserting their claimed title. Nor did they during the year 1950 claim any right to control the property or any of the proceeds therefrom. So far as the record shows, both parties continued to treat the land as the property of

the plaintiff until February, 1950. Moreover, the only disinterested witness, who testified concerning the plaintiff's intention in the execution of the deed, was the attorney who prepared it. His testimony corroborates the plaintiff, as do all of the other facts and circumstances mentioned. On the other hand, the testimony of Mrs. Whyte to the effect that the plaintiff said she was carrying out the wishes of her deceased husband, is unsupported except by the bare fact that the deed was given into her keeping. *The clear weight of the evidence is against the finding. It follows that the finding is not supported by the evidence and will not support the judgment.*

> *Claunch, supra,* 73 Idaho at 248–50, 249 P.2d at 917–19 (emphasis added).

It would be difficult to find another case bearing such great similarity to the case at bench. The trial court decision and the opinion Justice McFadden proposes for this court fail to give any consideration to the existence of a fiduciary relationship[3] and the requirement of clear, satisfactory, convincing and unequivocal evidence. The wife's testimony in this case, even standing alone from that of the husband, is so equivocal as to destroy all possibility of its being clear, satisfactory, and convincing. And, too, there is more than her testimony. Not only did her complaint in *this* action fail to allege that the two properties in question, although acquired during coverture, had become her sole and separate property, but in a prior complaint filed by her in September of 1978, alleged only:

> That during the course of the parties' marriage they have acquired certain real and personal property, which property should be divided equally by the Court.

> Husband's Exhibit No. 2.

Sixteen months after execution of the unrecorded deed to the Kuna five acres, the husband and wife joined in executing a deed of trust to the same, using the property to secure their note for a substantial loan from a local bank. Husband's Exhibit No. 3. In May of 19__, the wife alone submitted a financial statement for Mr. Q's to another local bank. The statement, an application for a line of credit, listed "Leonard and Sherilyn Hunt" as the name of the applicant. Husband's Exhibit No. 8. Another loan application to the same bank in October of 1980, again signed only by the wife, listed Leonard Hunt as co-applicant. This was three months after the filing of the 1980 divorce complaint which made no allegation of any community property which had become the wife's sole and separate property. Husband's Exhibit No. 7.

When the liquor license was obtained for Mr. Q's on February 4, 1975, the state issued it to Leonard E. Hunt. Husband's Exhibit No. 10. The 1980 profit and loss statement for Mr. Q's showed Leonard Hunt as the proprietor, and listed his social security number. The depreciation schedule thereof listed as names shown on the return, "Leonard and Sherilyn Hunt, dba Mr. Q's." Husband's Exhibit No. 9. The wife, on being confronted with those and other exhibits, was not convincing in the least in her equivocating explanations, referred to by the husband's counsel summing up at the conclusion of the summary judgment proceeding.

On direct examination by her own attorney, the wife testified in contradiction to her affidavit attached to her motion for summary judgment. Having there sworn that the Kuna five acres deed was given to her in 1973, at trial she would be obliged to recant:

> Q. I'd like to hand you now what's been marked on the back as (Plaintiff's) Defendant's Exhibit 2, and can you identify what that document is?

---

**3.** That a fiduciary relationship exists between a husband and a wife is so obvious that courts merely refer to that principle only by way of comment. *See,* for instance, *Compton v. Compton,* 101 Idaho 328, 612 P.2d 1175 (1980); *Boeseke v. Boeseke,* 10 Cal.3d 844, 519 P.2d 161, 164, 112 Cal.Rptr. 401, 404 (1974); *Kulchar v. Kulchar,* 1 Cal.3d 467, 462 P.2d 17, 21, 82 Cal.Rptr. 489, 493 (1969); *Key v. Key,* 388 P.2d 505, 510 (Okl.1963); *Brasier v. Brasier,* 200 Okl. 689, 200 P.2d 427, 432 (1948).

A. Yes, it's a Quitclaim Deed from Leonard to me of a five-acre parcel of property in Kuna.

Q. And did you have that quitclaim Deed in your possession?

A. Yes, I did.

Q. And do you recall when you received that Quitclaim Deed in your possession?

A. .... Sometime in May.

Q. OK. And do you recall when that property was purchased?

A. In May, 19—May of 1974, I believe.

Q. And do you recall when Leonard purchased that property?

A. It was just prior to this deed. This was the 24th of May.

Q. OK. Now, *there was some confusion in your affidavit* and that's why I wanted to clear this up. So that *at the time of the reconciliation, you and Leonard had not yet owned that property?*

A. That's correct.

Tr., pp. 9–10 (emphasis added).

Having sworn in her affidavit that "in an effort to get me to do so [return to him], Leonard Hunt gave to me as a gift a quitclaim deed to the five-acre parcel of property, in Kuna ...," she would now completely retreat from that premise. Now the inducement for the gift would vanish from sight:

Q. When he purchased that property did you and he have a discussion concerning that property?

A. Yes. ... When we discussed purchasing it, I asked him if he would Quitclaim it to me and he agreed.

Q. OK, as your separate property?

A. Yes.

Tr., p. 10.

She then proceeded with an attempt to justify the nonrecording:

Q. OK. And ... did you cause to have that deed recorded in 1982?

A. Yes.

Q. OK. And was there any reason that it was not recorded from the period in time when you received it in 1974 until 1982?

A. Well, Leonard had told me it wasn't good for financial statements or if we had to borrow money, it would be better in ... both our names.

Q. For financial applications, is that what you're talking about?

A. Uh-huh.

Tr., p. 10.

That all looks very bad from the viewpoint of an inquiring mind, but that is not all. Her affidavit had stated that the undated, unwitnessed, unacknowledged assignment to Mr. Q's was at approximately the same time as the giving of the deed to the Kuna five acres "handed to me personally." Faced now with the problem that the Kuna parcel had not been acquired, the trial testimony took a different tack:

Q. And could you tell me what No. 3 is—Exhibit 3, can you just tell me what that is?

A. It's an assignment of the interest in Mr. Q's to me by Leonard.

Q. And who gave you that document?

A. Leonard did.

Q. And when and how did that document come about?

A. ... *When we were discussing the reconciliation he had promised that he would put Mr. Q's in my name. I didn't receive the document until sometime in April or May of 1974.*

Q. OK. And was it given to you personally by someone?

A. Yes, by Leonard.

Tr., p. 11 (emphasis added).

Tossing aside that *putting Mr. Q's in her name* is not tantamount to a wholly completed *inter vivos* gift *in praesenti*, it would be difficult to imagine two sets of more blatant equivocation than this. Other than the foregoing, her own attorney established nothing but her own self-serving "understanding" as to the status of the ownership of the two properties. As to Mr. Q's:

Q. Now, the document purports—well, it says, "I, Leonard E. Hunt do

hereby assign all of the interest in a pub." ... Did you have any understanding as to what he was assigning to you?

A. I understood it to be Mr. Q's.

Q. All of the interest in it?

A. Everything to do with it, yes.

Tr., pp. 13–14.

As to the Kuna five acres:

Q. Do you consider that property to be your separate property?

A. Yes, I do.

Tr., pp. 10–11.

On cross-examination the wife denied that she had filed for a divorce in 1978, but then conceded that she had when a copy of her complaint was handed to her. Tr., p. 21. Asked about the 1975 deed of trust which both husband and wife had signed to obtain a bank loan, she as first denied any recollection, conceded it could have been done, and finally offered an equivocal hypothesis for both signatures:

Q. *Do you recall executing the Deed of Trust?*

A. *No, I do not.*

Q. OK. You don't recall that at all?

A. No, I don't.

Q. And *you didn't borrow money in 1975 and pledge this five acres in Kuna as security for that loan?*

A. *Oh, we could have, yes, but I* .....

Q. Just.....

A. ..... *don't recall it.*

Q. You don't remember anything about that document at all, is that what you're saying?

A. *It says that we borrowed what, $6,063.00?*

Q. *And pledged that same five acres of land* .....

A. Uh-huh.

Q. ..... *that you're claiming was deeded to you in 1974?*

A. *Yes. That must have been why he asked me not to record it.*

Q. *Oh, you're getting some recollection* of this?

A. *No, I'm not, but I can see if we were going to borrow* money against it

that it should be—*maybe it would be wise to have it in both names; I don't know.*

Tr., pp. 26–27 (emphasis added).

She was given the opportunity to examine Husband's Exhibit No. 7:

Q. ... Well, let me show you one that does have your signature on it? Did you on the 10th of October, 1980, file a loan application with Idaho First National Bank, Fairview office? ... And does that appear to be your signature on that document?

A. ... Yes, that is my signature.

Q. Alright, that's a loan application, is that correct?

A. Yes, uh-huh.

Q. One that you filled out on the 10th of October, 1980?

A. That's not my handwriting, but what do you mean?

Q. Well, you signed it.

A. Oh, yes, uh-huh.

Q. And ... *does that document not, in fact, show that Leonard is the owner of Mr. Q's?*

MR. HINES: I object, *I think the document speaks for itself.*

Tr., pp. 31–32 (emphasis added).

The exhibit was admitted. She was asked about Husband's Exhibit No. 9:

Q. ... Have you filed since 1974, joint tax returns ... with Leonard every year?

A. Yes.

Q. OK. And in every year that you've filed a joint tax return, have you listed the income of Mr. Q's as well as the expenses of Mr. Q's?

A. ... Yes.

Q. *Have you depreciated the depreciable assets of Mr. Q's every year since 1974 in a joint tax return?*

A. ... Have I personally done it, or.....

Q. No, has your joint tax return shown.....

A. *Oh, yes.*

Q. ..... the depreciation.....

A. That was (indiscernible), yes.

Q. ..... of Mr. Q's? Did you file a—I real—well,.....

(Defendant's Exhibit No. 9 marked)

Q. Showing you what's been marked as Defendant's Exhibit No. 9, I'd ask you if you recognize that document?

A. ... Yes, this looks like part of the 1980 tax return.

Q. Is that what you recognize that as being?

A. Yes.

Q. Your 1980 tax return, a copy of it?

(Inaudible response)

Q. It has a Schedule C on it, does it not? Isn't that what that schedule is on the second page?

....

Q. Can you tell me what each page of that exhibit is, if you know?

A. ... Well, the first page is the Profit and Loss.... The back of the first page I presume is the same thing, or has to do with the same thing. The second page is a Depreciation Schedule. The third page is a Depreciation Schedule.

Q. OK. Were those the schedules that you filed with your 1980 tax return?

A. ... Yes, they must have been.

Q. Now, you said as man—I believe in answer to Mr. Hines' questions, one of your duties as manager, operator, owner of Mr. Q's is you prepare a lot of these things, don't you? Not that, I'm not asking about that, but you.....

A. Uh-huh.

Q. ..... said you prepared quarterly taxes, and.....

A. Yes.

Q. ..... so you're familiar with accounting and tax documents, are you not?

A. ... In certain areas I am, yes.

Q. OK. You do recognize that as your Depreciation Schedule listed on your 1980 return, though?

A. Yes, uh-huh.

Q. And that's a joint return between you and Leonard?

A. Yes.

Tr., pp. 34–37 (emphasis added).

Additional testimony was elicited on the dominion over Mr. Q's:

Q. From 1974—or excuse me, 1970—yeah, 1974 until 1979, who was responsible for running Mr. Q's?

MR. HINES: During the whole period of time?

MR. REID: During the whole period of time.

A. Well, I was responsible during that period of time.

Q. Did Leonard share in the responsibilities?

A. ... Leonard and I did share the responsibilities, yes.

Q. Jointly?

A. We had discussions. I asked his opinions on things; he made certain decisions, yes.

....

Q. Did you make all the hiring and firing decisions in 1974?

A. No, huh-uh.

Q. Did you make the tax decisions in 1974, all by yourself?

A. No, not all by myself.

Q. Did you make all the purchases in 1974 all by yourself?

A. No.

Q. Did you sell the commodities or items that are offered for sale at Mr. Q's in 1974, all by yourself?

A. No.

....

Q. Did Leonard perform any management functions in 1975 to your knowledge?

A. To my knowledge? I presume he did.

Q. You don't know?

A. In 1975, we did have—we did do things jointly for a period of time during '75.

Q. And in 1976 did you do things jointly?

A. ... For a certain period of time, yes.

Q. How long a period of time?

A. ... Probably about half of the time.

Q. OK. How about 1977?

A. ... '77, I had assumed more of the ... responsibilities of Mr. Q's.

Q. How about 1978?

A. ... '78, I'd assumed more of the responsibilities of Mr. Q's.

Q. ... And then in 1979, Leonard left?

A. Yes.

Q. ... Do you recall what month it was in 1979 that Leonard and you separated I guess for the final time?

A. ... We separated around the middle of August, I believe.

Tr., pp. 46–49.

On redirect examination, apparently it was felt opportune that the wife should explain why over a number of years she had not asserted the 1973 (or 1974) gift to her of Mr. Q's:

Q. ... Now, on the subject of this assignment, was there a period of time that—where you did not know where that assignment was?

A. Yes, there was.

Q. And was it important to you in making your claim whether you had that assignment in hand?

A. Yes, that was the only document I had.

Q. And why was it important to you that you had it in hand?

A. Well,.....

MR. REID: Well, I'll object here. This calls for a conclusion. In other words, I don't—she's not testifying to facts now.

MR. HINES: Well, she ought to know why it's important to her that she have it in hand.

THE COURT: Yeah, I see nothing wrong with it, if she can answer it. The objection is overruled.

A. I knew Leonard would never admit to ... having—havin' giving (sic) me—given me Mr. Q's without that document.

Q. OK. Had you discovered the presence of that document at the time that your Divorce Complaint in 1980 was filed?

A. At the time it was filed?

Q. Yes.

A. No, I hadn't.

Q. OK,. You knew it was there, though?

A. Somewhere, yes.

Q. Now, ... have there been times after 1974 that you have allowed Leonard Hunt to represent to people that he was the owner of Mr. Q's?

A. I didn't—ye—my answer would be yes, but I didn't even think of it as allowing him. It was just ... I had not objection.

Q. OK. And why didn't you have any objection?

A. Well, we were husband and wife.

Tr., pp. 56–57.

Recross-examination found her vague:

Q. ..... to Mr. Hines' question, you said that in 1978 and also in 1980 when these Divorce Complaints were filed, you din't know where that assignment was.

A. That's correct.

Q. When did you find it?

A. It was sometime this year.

Q. When?

A. ... I can't really specify; I can't speculate exactly when.

Tr., p. 62.

She was further asked to compare her trial testimony to that given by her in a deposition:

Q. ... Do you remember being asked about the ownership of Mr. Q's on that day, by me?

A. ... I re—specifically?

Q. Specifically.

A. I'd have—I'd like to look at that and.....

Q. I'm just asking you if you remember me asking you.....

A. I remember.....

Q. ..... who owned Mr. Q's.

A. ..... you asking me a lot of questions.

Q. Do you remember telling me that you and your husband both owned it?

A. No, I'm sorry, I don't remember that.

Q. OK.

MR. REID: Your Honor, .....

THE COURT: Do you want her to look at the deposition on file?

MR. REID: Yes, Your Honor, could the witness be handed it?

THE COURT: If you'd refer her to a specific page and line number, Mr. Reid.

MR. REID: Yes, Your Honor.

Q. Could you turn to page 17? ... Could you read there, page—or excuse me, page 17, you can start on line No. 5. Would you just read that; continuing on through line 22?

(Pause)

A. ... Alright.

Q. Alright. Now, at the time you gave those answers, were you aware of the assignment?

A. Yes.

....

Q. Are you stating that the statements you made in the deposition are incorrect now?

A. No.

Q. They ... are correct statements?

A. Yes.

Tr., pp. 64–65.

Counsel may have seen some inconsistency—which we will never know, the depositions not being a part of the appeal record.

Such was all the testimony upon which the trial court at summary judgment proceedings entered the judgment awarding the Kuna five acres to the wife, and reserving judgment on Mr. Q's until a "regular" trial.

At the "regular" trial, rehashed testimony as to the alleged gifts of Mr. Q's and the Kuna five acres was taken. The wife's attorney apparently deemed it wise to now have her explain why no one knew that she thought she had acquired Mr. Q's lock, stock, barrel, lease, and liquor license:

Q. Had you—well, strike that. Now, at this point in time, the time of this transfer, did you and Leonard make any effort to make this known to your friend and acquaintances?

A. No.

Q. Was there any reason for that?

A. He said it was between us, it was our personal business.

Tr., p. 166.

That was the extent of it, but on cross-examination she embellished somewhat:

Q. Now, I believe your testimony was that in the fall of 1973, Leonard agreed to transfer to you the interest in Mr. Q's, and then sometime after that Exhibit No. 3 came into being, is that right?

A. That's correct.

Q. Well, what is it that you were going to give him for this interest in Mr. Q's?

A. I was going to ... come back into the marriage, make a home.

Q. Oh, you were going to agree to stay married to him?

A. ... Well, that's part of it.

Q. Anything else?

A. ... Come back and have a home again, and run Q's.

Q. And your statement to Mr. Hines was, you didn't tell any of your friends of this transfer, is that right?

A. It wasn't common knowledge.

Q. Who did you tell?

A. Oh, I told my mother.

Q. When did you tell her?

A. I don't remember when.

Q. Well, before or after 1974?

A. After 1974.

Q. Did you tell anybody else?

A. I think I told a couple of my girlfriends.

Q. Who?

A. Oh, the ones in California. Judy Galart (phonetic).

Q. Anybody else?

A. ... Mary Rose (phonetic).

Q. Anybody else?

A. Nobody in—in this area.

Q. Alright, now when was Mr. Q's first established? What year?

A. I believe the end of '72.

Q. Are you acquainted with Denny Sallaz?

A. Pardon?

Q. Are you acquainted with Denny Sallaz?

A. Yes.

Q. How is it you're acquainted with him?

A. He's a friend of Leonard's.

Q. Isn't he the attorney for Mr. Q's?

A. Yes.

Q. Hasn't he been the attorney for Mr. Q's since its inception?

A. I'm not sure about since its—since its inception, but it's been for quite a while.

Q. Since 1974?

A. Possible.

Q. Prior to 1974?

A. Possible.

Q. Did you tell Mr. Sallaz of this transfer?

A. No.

Q. Who's your accountant?

A. Ron Fletcher.

Q. How long has he been your accountant?

A. ... A few years.

Q. How many?

A. I'm not sure.

Q. More than ten?

A. I don't believe so.

Q. More than five?

A. I'm not sure.

Q. Could he have been your accountant in 1974?

A. ... I don't remember.

Q. Did you ever tell Mr. Fletcher of this transfer?

A. No.

Q. Are you acquainted with Russ Campbell?

A. Yes.

Q. How is it that you're acquainted with him?

A. He's the insurance agent?

Q. For who?

A. Mr. Q's.

Q. And you guys personally, right?

A. Yes, uh-huh.

Q. How long has he been your insurance agent?

A. ... Four or five years.

Q. Did you ever inform him that you were the sole owner of Mr. Q's?

A. No.

Tr., pp. 202–05.

Q. It's true, isn't is, Sheri, that the tax returns, the filings with the Department of Employment, the loan applications at the banks, the utility company deposits, the liquor license through Liquor Law Enforcement, the Ada County liquor license, and the Boise City liquor license since 1974 have all been in yours and Leonard's name, doing business as Mr. Q's?

A. That's correct.

Q. It's true that you've never made any attempt to transfer any of these license, . . . . .

A. No.

Q. . . . . . or loan applications, or filings with the Department of Employment?

A. No.

Q. It's true that you have filed tax returns since 1974, continuously every year, showing both yourself and Mr. Hunt as owners of Mr. Q's?

A. ... I believe they show him as proprietor.

Tr., p. 208.

The conclusion is readily drawable, and drawn, even without consideration of the conflicting testimony of the husband, that the wife did not prove all of the five requisite elements of the claimed gifts to her from her husband by evidence which was satisfactory, clear, convincing and unequivocal. Indeed, far from proving it even by a preponderance, the clear weight of the evidence is against a finding of any gift in either instance, from it follows, as the Supreme Court held in *Claunch*, the findings in turn *will not support the judgment.* For that reason the judgment to that extent should be reversed. If the other two

panel members do not agree, then, at the least, *Donnelinger* and *Sherry* require that this case at the very least should be returned to one of the lower courts for proper findings and for ultimate conclusions and judgment which display a proper regard for the requirements of establishing an *in praesenti inter vivos* gift as announced by the Idaho Supreme Court. This case has so far been so poorly treated in the courts below in that regard that in the interests of judicial economy I would vote that it be remanded to the district court with directions to conduct an entire trial de novo, as could have been done and should have been in the first instance, considering the substantial amount involved, and the posture of the case when it came up from magistrate court. It is not readily seen, for instance, the basis on which the magistrate voided the stipulated property settlement reached in open court, recorded on the minutes—and all in the presence and with the advice of counsel. The stated reason was no meeting of the minds, but that on this record appears to be only a conclusion. The summary judgment proceeding was an unprecedented aberration. It is difficult to know, let alone assess, how much, if any, of that record also was considered when the magistrate made the exceptionally sparse findings which can be gleaned from a memorandum opinion the *ratio decidendi* of which shows no application of strong precedential case law.

I have not bothered to address the legal sufficiency of the "document" by which the wife claimed a gift to her of Mr. Q's. In passing I mention only that the statute requires that a transfer from one spouse to another spouse be both executed *and acknowledged.* In *Andersen v. Crapo,* 99 Idaho 805, 589 P.2d 957 (1979), the Supreme Court of Idaho observed that in adoption proceedings, executed consents would be better taken before a judicial officer than before a notary empowered to take acknowledgements on instruments, usually deeds and mortgages. The reasons are obvious. Equally obvious, where a gift is to be evidenced by a document, that which is at stake is sufficiently important

that more than a signature is required. An acknowledgement before some official not only drives home to those involved the importance of that which they are doing, but serves to give an aurora of verity to the signature which is otherwise, as here, wholly missing. One would think that the legislature had in mind in requiring execution *and acknowledgement* a statutory provision with over a century of whiskers, I.C. § 9–409. It provides:

**Acknowledgement of private writings.**—Every private writing, except last wills and testaments, may be acknowledged or proved and certified in the manner provided for the acknowledgement or proof of conveyances of real property, and the certificate of such acknowledgment or proof is prima facie evidence of the execution of the writing, in the same manner as if it were a conveyance of real property.

One would think that the legislature may have also had in mind the provisions of § 32–912 as it existed years ago when the wife's acknowledgment had to be taken separate and apart from that of her husband. The reason then and equally applicable here, was to add additional verity to the instrument which had been executed—to avoid imposition of will, and have an official hear the person who had apparently subscribed to the instrument actually declare that he had done so. I see no logic, absolutely none, to the proposition that the acknowledgement is required only so that the instrument will be entitled to be placed of record. Such could not possibly have been a concern of the legislature in enacting the amendment to I.C. § 32–906. The statute requiring acknowledgement as a condition precedent to recording was already on the books, and had been so for years.

There is yet another ground upon which I would tend to reverse the judgments below. I say "tend," not because of any doubt that I would expect to so vote, but because the principle which I have in mind has not been addressed by the parties, and apparently has not arisen in the minds of

the other two members of the panel. The wife's affidavit offered in support of her summary judgment motion asking that Mr. Q's and the Kuna five acres be awarded to her as gifts was entirely premised on the basis of a *consideration* for the two instruments.

Consideration, of course, is an element of a contract or an agreement, whereas a gift is required to be entirely a voluntary act—not founded on an agreement to do something, or the doing of something for a consideration. The consideration stated in the wife's affidavit is plain. The husband wanted the wife "to return to him ... and in an effort to get [her] to do so ... gave [her] as a gift a Quit-claim to the five-acre parcel of property in Kuna ... and for the same reasons, [he] gave to [her] ... the assignment." And, the record shows that the parties did in fact reconcile in 1973. A more clear example of the wife's agreeing to return for a stated consideration would be hard to concoct. That arrangement, as the wife stated it in her affidavit, is viewable as a consideration coerced by her in return for the reconciliation. To my mind there is something inherently wrong in one spouse extracting property from the other as a condition precedent to staying married. The law law contemplates that all property acquired by a marital couple during coverture is *community property,* and it so vests on acquisition. One would think that if on entering into a marriage in the first instance, one spouse as a consideration of so doing extracted from the other spouse an executed, witnessed, acknowledged, and recorded agreement that all property which they thereafter acquired would belong to the demanding spouse as sole and separate property, such agreement would be held invalid as in contravention of public policy. And one would also be hard-pressed to see any measurable difference where the agreement is extracted as consideration for allowing the marriage to continue. Such an agreement, then, is not a voluntary gift, but exactly the contractual arrangement which it appears to be, and moreover questionable on public policy grounds at the same time.

Antenuptial agreements such as I have mentioned have come before the courts in other states. The main concern of those courts is whether such agreements encourage or promote divorce. The most recent California appellate court to consider the proposition was *Noghrey v. Noghrey,* 169 Cal.App.3d 326, 215 Cal.Rptr. 153 (1985), which I commend as educational reading. Among other cases discussed therein is a quotation of the holding in a case much like the one we review here: "An agreement between husband or wife founded upon consideration to withdraw or abandon a defense to a suit for divorce, or *do anything to facilitate procuring the same,* is illegal and void," .... *Noghrey, supra,* 215 Cal.Rptr. at 156 (quoting from *Newman v. Freitas,* 129 Cal. 283, 61 P. 907 (1900)). The court in *Noghrey* concluded its opinion with this apt observation: "The prospect of receiving a house and a minimum of $500,-000 by obtaining the no-fault divorce available in California would menace the marriage of the best-intentioned spouse." *Noghrey, supra,* 215 Cal.Rptr. at 157.

Just a year ago the Supreme Court of Ohio in *Gross v. Gross,* 11 Ohio St.3d 99, 464 N.E.2d 500 (1984) had before it an antenuptial agreement which provided alimony for one of the parties. Appropos to our *Hunt* case, that court observed that in general such agreements may be

valid and enforceable if three basic conditions are met: one, if they have been entered into freely without fraud, duress, coercion or overreaching; two, if there was a full disclosure, or full knowledge, and understanding, of the nature, value and extent of the prospective spouse's property; and, three, if the terms do not promote or encourage divorce or profiteering by divorce.

....

A hypothetical example of the type of situation which condition three seeks to avoid is where the parties enter into an antenuptial agreement which provides a significant sum either by way of property settlement or alimony at the time of a divorce, and after the lapse of an undue

short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows.

*Gross, supra,* 464 N.E.2d at 506.

The court went on to observe in the case before it:

We believe that the underlying state interest in the welfare of the divorced spouse, when measured against the rights of the parties to freely contract, weighs in favor of the court's jurisdiction to review, at the time of a subsequent divorce, the terms in an antenuptial agreement providing sustenance alimony for one of the parties. There is sound public policy rationale for not strictly enforcing such a provision which, even though entered into in good faith and reasonable at the time of execution, may have become unreasonable or unconscionable as to its application to the spouse upon divorce. It is a valid interest of the state to mitigate potential harm, hardship, or disadvantage to a spouse which would be occasioned by the breakup of the marriage, and a strict and literal interpretation of the provisions for maintenance of the spouse to be found in these agreements.

*Id.,* 464 N.E.2d at 509.

And, the court's holding in the case was:

Under the facts here, and in light of the law pronounced in this opinion, we find the provisions for maintenance within this agreement to be unconscionable as a matter of law and voidable by Mrs. Gross. Accordingly, we hold that the provisions within this agreement for the maintenance of Mrs. Gross should be reviewed by the trial court, and alternative provisions be ordered by the court.

*Id.,* 464 N.E.2d at 510.

There is, of course, considerably more to the opinion than the excerpts. This decision too is recommended reading.

As shown at an early point above, the wife at trial found it necessary to contradict her affidavit so that her testimony would comport with the facts as they actually existed. See her recantation at pp. 577 and 578, *supra,* supported by pp. 9 and 10 of the transcript, and again specifically as to Mr. Q's at p. 578, *supra,* supported by the transcript at p. 11. Her case theory then changed to receiving the assignment in April or May of 1974, impliedly given pursuant to the husband's promise extracted by her at least a half year earlier at the time she correlatively agreed to the reconciliation.

Whether one examines the theory advanced by the affidavit supporting her motion for summary judgment, or the theory to which she switched at the two trials, it all comes out the same—an involuntary assignment of Mr. Q's made in consideration of continuing the relationship with her husband—obviously fraught with coercion—and obviously a vast potential for encouraging and promoting a divorce where, assuming the validity of the agreement, she would garner for herself a property worth an impressive amount of money, by the husband's testimony elicited by the wife's attorney, $230,000. Tr., p. 132.

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Judge.

The majority apparently continues its failure to observe that there are here involved two distinct bodies of statutory law. Title 55 in Volume 9A of the Idaho Code, p. 486, is aptly titled: "PROPERTY IN GENERAL," and Chapter 6 thereof deals *generally* with "Transfer of Real Property," and Chapter 7 deals *generally* with "Acknowledgments."[1]

---

1. Going into statehood and until 1907, the same chapter dealt *specifically* with the acknowledgments of married women:

The acknowledgment of a married woman to an instrument purporting to be executed by her, must not be taken, unless she is made acquainted by the officer with the contents of the instrument on an examination without the hearing of her husband; nor certified, unless she thereupon acknowledges to the officer that she executed the instrument, and that she does not wish to retract such execution.

Rev. Statutes of Idaho, § 2956.

Entirely separate and distinct from Title 55 is Title 32, "DOMESTIC RELATIONS." Chapter 9 thereof deals *specifically* with "Husband and Wife-Separate and Community Property." Vol. 6 of the Idaho Code, p. 437. I.C. § 32–912 has *specifically* always required both husband and wife to join in executing *and acknowledging* deeds or other instruments of conveyance.

By reason of a 1980 amendment to § 32–906, similarly execution and acknowledgment are both required where one spouse conveys to the other:

**Community property—Income from separate and community property— Conveyance between spouses.—**(1) All other property acquired after marriage by either husband or wife is community property. The income of all property, separate or community, is community property unless the conveyance by which it is acquired provides or both spouses, by written agreement specifically so providing, declare that all or designated property shall be the separate property of one of the spouses or the income from all or specifically designated separate property be the separate property of the spouse to whom the property belongs. Such property shall be subject to the management of the spouse owning the property and shall not be liable for the debts of the other member of the community.

(2) Property conveyed by one spouse to the other shall be presumed to be the sole and separate estate of the grantee and *only* the grantor spouse need execute *and acknowledge* the deed or other instrument of conveyance notwithstanding the provisions of section 32–912, Idaho Code; provided, however, that the income from such property shall not be the separate property of the grantee spouse unless this fact is specifically stated in the instrument of conveyance. (Emphasis added.)

The majority opinion acknowledges the existence of the 1980 law, p. 563, but by judicial fiat declares that, as under *general* law, a spouse's acknowledgment is not essential to a valid transfer. This I continue to find incomprehensible when the 1980 law is so closely patterned after the *specific* language of § 32–912 *in the same title and chapter*, and in fact recognizes its requirements. Moreover, prior to the 1980 amendment, and since 1943, the statutory law was much the same. During that period of time, I.C. § 32–906 read:

**Community property—Conveyances between spouses.—**All other property acquired after marriage by either husband or wife, including the rents and profits of the separate property of the husband and wife, is community property, unless by the instrument by which any such property is acquired by the wife it is provided that the rents and profits thereof be applied to her sole and separate use; in which case the management and disposal of such rents and profits belongs to the wife, and they are not liable for the debts of the husband. Rents and profits as used in this chapter shall mean income only. Real property conveyed by one spouse to the other shall be presumed to be the sole and separate estate of the grantee *and only the grantor spouse need execute and acknowledge the deed or other instrument of conveyance notwithstanding the provisions of section 32–912.* All deeds or conveyances heretofore made in conformity herewith are hereby validated. (Emphasis added.)

Neither § 32–912 nor § 32–906 are found in the *general* provisions of Title 55; both are not and have forever been contained in Title 32, Chapter 9, *specifically* dealing with the community property of husband and wife, and transfers by both of them together to third parties, I.C. § 32–912, and interspousal transfers, § 32–906. The salient requirements to making a valid conveyance are identical other than that in an interspousal transaction the grantee spouse

For unknown reasons, instead of simply repealing it, the legislature made it read as it still does to this date, making it rather meaningless.

need not join in the execution and acknowledgment. That this is so is readily ascertainable:

> § 32–912. **Control of community property.**—... neither the husband nor wife may sell, convey or encumber the community real estate *unless the other joins in executing and acknowledging* the deed or other instrument of conveyance,....
>
> § 32–906. **Community property—Income from separate and community property—Conveyance between spouses.**—... only the grantor spouse *need execute and acknowledge* the deed or other instrument notwithstanding the provisions of section 32–912....

Brockelbank's work, *Community Property Law of Idaho* (1962), makes clear the reason for the 1943 amendment which relieved the grantee spouse from joining in the execution and acknowledgment which is otherwise required by § 32–912:

> [A]t a time when men were leaving the state for war service. Many of them were doubtful whether they would ever return. Many husbands, with full trust in their wives, wanted to convey to them all their land so that the wife would have indisputable title and be able to deal with the land in any emergency. But whether this could be done and the form in which it could be done was left in doubt by the provision in Section 32–912 which recites that the husband "can not sell, convey or encumber the community real estate unless the wife join with him in executing and acknowledging the deed or other instrument of conveyance...." W.J. Brockelbank, *The Community Property Law of Idaho* (1962), p. 125.

Those of us in law school at the University of Idaho at the end of that war well learned from Dr. Brockelbank that the specific provisions of Title 32 were absolute in the proposition that where community property was concerned, acknowledgments were required, and that the requirement was for validity, not simply so as to be acceptable for recordation, as the majority wholly misunderstands. During that period of time the case of *Morgan v. Firestone Tire & Rubber Co.*, 68 Idaho 506, 201 P.2d 976 (1948), was decided, which served as a good predicate upon which to expound the law, and Dr. Brockelbank did so. In volume 5 of the Idaho Reports, two cases stand back to back, decided on the same day and both dealing with the specific requirement of acknowledgment *where community property is involved. Bunnell & Eno Co. v. Curtis*, 5 Idaho 652, 51 P. 767 (Dec. 18, 1897); *Cooperative Savings & Loan Association v. Green*, 5 Idaho 660, 51 P. 770 (Dec. 18, 1879). In *Bunnell*, the Court made it clear that: *"The acknowledgment of the execution*, while no part of the instrument itself, *is a part of the execution."* [2]

Turning ahead, 80 years after *Bunnell*, this Court, per Bakes, J., said of the § 32–912 requirements that: "This portion of the section ... has been interpreted to mean that *instruments* conveying community realty, even when signed by both husband and wife, *are ineffective unless acknowledged* by both husband and wife." (Emphasis added.) *Furness v. Park*, 98 Idaho 617 n. 1, 570 P.2d 854 n. 1 (1972); *Durant v. Snyder*, 65 Idaho 678, 151 P.2d 776 (1944). *Durant* said very little other than that a five year lease of community property not acknowledged by either the husband or the wife was not enforceable. For that well-established principle it cited to four earlier cases. *Fargo v. Bennett*, 35 Idaho 359, 206 P. 692 (1922); *Burnham v. Henderson*, 47 Idaho 687, 278 P. 221 (1929); *Little v. Bergdahl Oil Co.*, 60 Idaho 662, 95 P.2d 833 (1939); *Abbl v. Morrison*, 64 Idaho 489, 134 P.2d 94 (1943). *Little* contained this applicable quote from *McKin-*

---

**2.** The Court went on to add, not here pertinent, but a point to be remembered: "But the certificate of acknowledgment made by the officer who takes the acknowledgment is no part of the instrument, but is merely evidence of the execu-

tion of the instrument." *Id.* This was pointed out in *In re GVR Ltd. Co., Inc.*, 107 Idaho 1101, 695 P.2d 1240 (1985), in connection with the earlier case of *In re New Concept Realty*, 107 Idaho 711, 692 P.2d 355 (1984).

*ney v. Merritt,* 35 Idaho 600, 604, 208 P. 244, 248 (1922):

> We are not authorized to eliminate from the statute the requirement that the wife acknowledge as well as execute the instrument whereby it is sought to sell or encumber community property.

The *McKinney* holding was even more forceful than the partial quotation used by the *Little v. Bergdahl* Court. In full it reads:

> In the case of *Knudsen v. Lythman,* 33 Ida. 794, 200 Pac. 130, it was held that an acknowledgment by the wife, as provided by law, is essential to the validity of a mortgage of community property, and we think the same rule applies where there is a contract of option to sell community property. We are not authorized to eliminate from the statute the requirement that the wife acknowledge as well as execute the instrument whereby it is sought to sell or encumber community property. This is for the legislature and not for the court. We must accept the statutes as we find them and construe them as they read, where they are plain and unambiguous, and are not permitted to apply rules of construction in the absence of ambiguity.
>
> From what has been said it would seem that the rule of law is settled in this state to the effect that an acknowledgment by the wife is necessary to the validity of any instrument whereby community property is sold, conveyed or encumbered. (*Childs v. Reed,* 34 Ida. 450, 202 Pac. 685.) *McKinney, supra,* 35 Idaho at 604–05, 208 P. at 248–49.

In the same year that the Court decided the *McKinney* case, two months earlier, it held that "if a lease of community property for a term of years is a conveyance or encumbrance the wife must join with the husband in executing and acknowledging it,...." *Fargo, supra,* 35 Idaho at 360, 206 P. at 693.

The majority's reliance on *Mollendorf v. Derry,* 95 Idaho 1, 501 P.2d 199 (1972), is even more off base. The author of that opinion knew what the law was. Title 32,

Chapter 9 was not involved, which is understandable where the deed in question was a grant of the sole and separate property *of a bachelor.* What more need be said?

Coupling all of this with the highly suspect and long delayed production of the "assignment" of Mr. Q's, I continue to dissent and expect that this gross misapplication of statutory law and resultant miscarriage of justice will be reviewed by the Supreme Court.