[No. A025349. Sixth Dist. June 14, 1985.]

In re the Marriage of FARIMA and KAMBIZ NOGHREY.
FARIMA NOGHREY, Respondent, v.
KAMBIZ NOGHREY, Appellant.

**COUNSEL**

Philip L. Hammer, Beauzay, Hammer, Ezgar, Bledsoe & Sprenkle, Richard Sherman and De Goff & Sherman for Appellant.

John S. Yohanan, Marvin M. Mitchelson and Sat Karam Kaur Khalsa for Respondent.

**OPINION**

**FOLEY, J.***—Kambiz Noghrey appeals from a decision finding valid a premarital agreement. We reverse.

### Background

Kambiz and Farima were married for seven and one-half months when Farima filed for divorce. Her petition alleged the existence of an antenuptial agreement setting forth the property rights of the parties. The issue of the existence and validity of the agreement was bifurcated from the dissolution proceeding and heard first.

Frances and Charles Kandel had known Farima for several years prior to her marriage. Farima lived with the Kandels for the two years preceding

---

*Assigned by the Chairperson of the Judicial Council.

the wedding.

Mrs. Kandel testified that when she and her family arrived for the Noghrey wedding Farima and Kambiz were not yet present, nor were Farima's parents. As she entered the hotel where the wedding was to take place, Mrs. Kandel was met by Kambiz' brother, Jamshid, who asked Mrs. Kandel and her husband to step aside. He handed Mrs. Kandel a piece of paper and pen and then began, with Kambiz' cousin, dictating terms of a premarital agreement.

Mrs. Kandel remembered writing "I, Kambiz Noghrey, agree to settle on Farima Human, the house . . . [i]n Sunnyvale, . . . [a]nd $500,000.00 or one-half of my assets, whichever is greater, in the event of a divorce." The agreement was written on the reverse side of the ceremonial wedding certificate which Mrs. Kandel believes was given to the rabbi.[1]

Mrs. Kandel then brought the completed document to Kambiz for his signature. Kambiz indicated he knew what the document was and that he wanted to sign the agreement. Mrs. Kandel testified she cautioned Kambiz to be very careful and to read the document because he would be giving his wife half of everything he had. She inquired whether Kambiz wanted to sign the document. According to Mrs. Kandel, Kambiz indicated he would gladly give the property to his bride-to-be and he appeared serious when making the statement. Kambiz and Farima then signed the document, with Mr. Kandel and Kambiz' cousin signing as witnesses.

Farima testified that she signed the document because a husband has to give some protection to a new wife in case of divorce. She explained that it is hard for an Iranian woman to remarry after a divorce because she is no longer a virgin. In return for the premarital agreement, Farima gave Kambiz assurances that she was a virgin and was medically examined for that purpose.

Kambiz testified that he did not wish to sign the agreement but was coerced into doing so by Farima's mother. Kambiz claimed he told Mrs. Human he did not want to sign the agreement but she forced him into doing so by stating there would be no wedding if he did not sign. Kambiz' brother Jamshid, also testified that Farima's mother coerced Kambiz into signing the agreement. Jamshid testified he did not dictate terms to Mrs. Kandel

---

[1]Kambiz and his brother testified that the document was given to Farima's father. In any event, the document could not be found for trial.

and she was told by Farima's parents what to put into the agreement prior to the wedding date. Kambiz testified he believed Farima's mother or father told Mrs. Kandel what to put into the agreement. However, Jamshid admitted he did not observe Mr. or Mrs. Human giving instructions or dictating terms to Mrs. Kandel at the wedding and Mrs. Kandel testified she did not discuss the terms of the agreement with the bride's mother.

*Discussion*

Of the many issues raised by Kambiz in this appeal, we find the first dispositive. We are in accord with his view that the antenuptial agreement on which this case centers encourages and promotes divorce. It is hence contrary to the public policy of this state and unenforceable.

As previously noted, the issues of the agreement's existence and validity were bifurcated from the remaining issues in the case and tried separately. Following trial of these issues the trial court filed the following Memorandum of Decision: "It is the opinion of the Court that the petitioner and respondent entered into a written antenuptial agreement, also known as 'Katuba' [*sic*], prior to their marriage.[2] The terms of the agreement were as follows: 'I, Kambiz Noghrey, agree to settle on Farima Human the house in Sunnyvale and $500,000 or one-half my assets, whichever is greater, in the event of a divorce. The said agreement should be found to be a valid, binding, and enforceable agreement."[3]

An antenuptial agreement, the terms of which encourage or promote divorce, is against public policy and is unenforceable. This state's highest court has stated the matter thusly: "Contracts which facilitate divorce or

---

[2]The *kethuba* is a marriage document which represents the obligation of the husband under the Jewish faith to, inter alia, provide for his wife upon divorcing her. Since the husband could apparently divorce his wife at will, the *kethuba* was a device created to provide economic security for the wife; but was also intended to discourage divorce by making it costly and undesireable for the husband. The wife, on the other hand, was not as free to divorce and was subject to loss or reduction of her rights should she divorce her husband on certain grounds. ("Kethuba" by Rachel Bernstein Wischnitzer, *The Universal Jewish Encyclopedia* (1942) Vol. 6, pp. 367-372.)

Although the very roots of the *kethuba* are embedded in religious doctrine, we do not reach the issue of whether a civil court, applying neutral principles of law, could interpret and construe such a document and resolve the property issues in question without running afoul of the Establishment clauses of the federal and state Constitutions.

[3]This matter was transferred from the First Appellate District to this court upon order of our Supreme Court. Farima moved to dismiss the appeal while this matter was pending in the First Appellate District. Her motion was denied on July 24, 1984 (Rouse, J., dis.). Considering the length of time this matter has been pending and the manifest importance of the decision to the remaining issues in the case, we do not now question its appealability. In any event, see *In re Marriage of Van Sickle* (1977) 68 Cal.App.3d 728, 742-743 [137 Cal.Rptr. 568].

separation by providing for a settlement only in the event of such an occurrence are void as against public policy. [Citations.]" (*In re Marriage of Higgason* (1973) 10 Cal.3d 476, 485 [110 Cal.Rptr. 897, 516 P.2d 289].)

This rule of law appears to have prevailed in California practically from the inception of statehood. The following cases and language therefrom, while not meant as an exhaustive catalogue of the authorities on the subject, are illustrative of the point: *Morgan* v. *Morgan* (1923) 190 Cal. 522, 525 [213 P. 993] ["It is not the policy of the law to encourage divorces."]; *Whiting* v. *Whiting* (1923) 62 Cal.App. 157, 167 [216 P. 92] ["If contracts of this nature tend to facilitate the dissolution of the marriage relation, then they should not be sanctioned by the courts . . ."]; *Newman* v. *Freitas* (1900) 129 Cal. 283, 289 [61 P. 907] ["an agreement between husband and wife founded upon consideration to withdraw or abandon a defense to a suit for divorce, or *do anything to facilitate procuring the same,* is illegal and void," italics added]; *Estate of Nelson* (1964) 224 Cal.App.2d 138, 142 [36 Cal.Rptr. 352] [". . . this contract tended to encourage and facilitate the dissolution of the marriage relationship and was contrary to public policy. . . ."]; *McCahan* v. *McCahan* (1920) 47 Cal.App. 173, 175 [190 P. 458] ["it has been repeatedly held in this state that an agreement between husband and wife to do anything to facilitate procuring a divorce is illegal and void."]; *Loveren* v. *Loveren* (1895) 106 Cal. 509, 512 [39 P. 801] [" 'The authorities are uniform in holding that any contract between the parties having for its object the dissolution of the marriage contract, or *facilitating that result,* . . . is void as *contra bonos mores,*' " (italics in original)].

 We wish it understood that not all antenuptial agreements violate public policy. Such agreements by which the parties provide for their property rights are not *ipso facto,* illegal and void. Antenuptial agreements dealing with property owned prior to marriage and property and earnings accumulated subsequent to marriage are generally valid. (*In re Marriage of Dawley* (1976) 17 Cal.3d 342, 351 [131 Cal.Rptr. 3, 551 P.2d 323].) *Dawley,* nevertheless, reaffirmed the rule that such contracts are offensive to the public policy of this state if the "terms of the contract 'facilitate,' 'encourage,' or 'promote' divorce or dissolution." (*Id.,* at p. 350.) The court further pointed out that the term "facilitate" should not be misconstrued so as to render illegal agreements that merely define the property rights of spouses, thereby simplifying the issues and reducing the costs of a dissolution proceeding. "[P]ublic policy does not render property agreements unenforceable merely because such agreements simplify the division of marital property; it is only when the agreement encourages or promotes dissolution that it offends the public policy to foster and protect marriage." (*Id.,* at p. 350, fn. 5.)

The agreement before us, however, is not of the type that seeks to define the character of property acquired after marriage nor does it seek to ensure the separate character of property acquired prior to marriage. This agreement is surely different and speaks to a wholly unrelated subject. It constitutes a promise by the husband to give the wife a very substantial amount of money and property, *but only upon the occurrence of a divorce.* No one could reasonably contend this agreement encourages the husband to seek a dissolution. Common sense and fiscal prudence dictate the opposite. Such is not the case with the wife. She, for her part, is encouraged by the very terms of the agreement to seek a dissolution, and with all deliberate speed, lest the husband suffer an untimely demise, nullifying the contract, and the wife's right to the money and property.

The Supreme Court of Ohio recently upheld the basic validity of antenuptial agreements as long as the terms of such agreements do not promote or encourage divorce or profiteering by divorce. (*Gross* v. *Gross* (1984) 11 Ohio St.3d 99 [464 N.E.2d 500].) Speaking on the subject, that court described a hypothetical provision that it considered violative of public policy as follows: ". . . where the parties enter into an antenuptial agreement which provides a significant sum either by way of property settlement or alimony at the time of a divorce, and after the lapse of an undue short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows." (*Id.,* at p. 506.) One is struck by the remarkable similarity of the hypothetical posed by that court and the agreement now before this court.

In this case, the primary focus at trial was on the existence *vel non* of the agreement with Kambiz contending he had been coerced into signing it just moments prior to the ceremony and Farima disputing this with a version that had Kambiz volunteering the document immediately before the ceremony as a token of his honor and good intentions. In all fairness to the trial court we note the existence issue overshadowed the issues of validity and public policy with the result that little evidence was introduced relative to the latter.[4] Farima did testify that neither she nor her parents possessed great wealth. The prospect of receiving a house and a minimum of $500,000 by obtaining the no-fault divorce available in California would menace the marriage of the best intentioned spouse.

---

[4]In further deference to the trial court we note substantial evidence supports the court's finding as to the existence and content of the agreement, and, the lack of any coercion, duress or fraud in its derivation. It should also be noted that neither appellant's present trial counsel, nor counsel who represented him on appeal, were involved at the trial of this matter.

*Disposition*

The judgment of the trial court is reversed.

Panelli, P. J., and Agliano, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 18, 1985. Bird, C. J., was of the opinion that the petition should be granted.