[No. G004356. Fourth Dist., Div. Three. Oct. 5, 1988.]

In re the Marriage of AWATEF and NABIL A. DAJANI.
AWATEF DAJANI, Appellant, v.
NABIL A. DAJANI, Respondent.

**COUNSEL**

Donald J. Stern for Appellant.

Patricia Herzog for Respondent.

**OPINION**

**CROSBY, J.**—Will a California court enforce a foreign dowry agreement which benefits a party who initiates dissolution of the marriage? *No.*

I

Awatef and Nabil Dajani married by proxy in Jordan in 1982. At that time husband resided in the United States. Wife subsequently joined him in Orange County in 1983, and the couple married in a civil ceremony. Wife petitioned for dissolution of the marriage in 1985. The primary issue at trial was husband's obligation, per the terms of the foreign proxy marriage contract,[1] to pay wife's dowry.[2]

Wife testified the contract called for a dowry of 3,000 Jordanian dinars, plus an additional 2,000 dinars in cash or household furniture.[3] As was the custom, she received a token payment on the dowry of one dinar when the marriage by proxy was performed, and the balance was not due until the marriage was dissolved or husband died. Her expert on the subject was an attorney admitted to practice in California and Egypt who testified the dowry provided for a cash payment to the wife in the event of death or

---

[1] Neither the original contract, written in Arabic, nor an English translation of the document was admitted in evidence. There was no dispute that the agreement was authorized by the parties; they disagreed only as to the amount of dowry and legal effect of the document under Islamic law.

[2] Black's Law Dictionary explains, " 'Dower,' in modern use, is distinguished from 'dowry.' The former is a provision for a widow on her husband's death; the latter is a bride's portion on her marriage. Wendler v. Lambeth [1901] 163 Mo. 428, 63 S.W. 684." (Black's Law Dict. (4th ed. 1951) p. 581, col. 1.) The "estate[ ] of dower . . . [is] not recognized." (Prob. Code, § 6412; but see Civ. Code, § 5312, subd. (a)(3), effective Jan. 1, 1986, which permits parties to a premarital agreement to contract with respect to "[t]he disposition of property upon . . . death . . . .")

[3] At the time of trial the exchange rate was approximately 2.94 dinars to the dollar.

dissolution of the marriage. In the latter case, the sum was due no matter which party initiated the dissolution proceedings.

Husband admitted he authorized the proxy contract, but claimed wife misrepresented the sum he would be obliged to pay if the marriage was dissolved. His expert was an Iman, the Islamic equivalent of a priest or rabbi, who taught local college courses in Islamic customs. He agreed one purpose of the dowry was to provide security for a wife in the event of death or dissolution of the marriage. But he added the dowry could also be an outright gift. Regardless of the purpose, however, a wife forfeited her right to the dowry if she initiated the dissolution proceedings.

In a ruling announced from the bench, the court stated, "[T]here is a valid dowry in existence; [ ] both parties are obligated to perform the conditions of the dowry. [¶] The court also finds that, based upon the testimony, the law in existence would be that of the Jordanian or Moslem law and finds that if the wife initiates a termination of the relationship, she foregoes the dowry and the court so finds that in this case the wife initiated the termination of the marriage and common sense and wisdom of Mohamed [*sic*] would dictate that she forego the dowry, unless the parties agree otherwise, and here they do not agree otherwise."

Wife has appealed, arguing the husband's expert was not qualified and the court had no choice but to honor the dowry provision: "[D]enying the dowry because the wife initiated the dissolution is an unjust result and against public policy." We agree a public policy argument is appropriate here, but not the one urged by wife.

## II

Wife devotes a considerable portion of her brief to a challenge of the qualifications of husband's expert. It is not necessary for us to enter that fray, however. The judge reached the correct decision no matter which expert he believed, for wife's own evidence was fatal to her claim.

■ Prenuptial agreements which "facilitate divorce or separation by providing for a settlement only in the event of such an occurrence are void as against public policy. [Citations.]" (*In re Marriage of Higgason* (1973) 10 Cal.3d 476, 485 [110 Cal.Rptr. 897, 516 P.2d 289].)[4] In this case, relying solely on evidence presented by wife, the Jordanian marriage contract must be considered as one designed to facilitate divorce: With the exception of the token payment of one Jordanian dinar (at the time of trial worth

---

[4] Premarital agreements executed on or after January 1, 1986, are governed by the Uniform Premarital Agreement Act (Civ. Code, § 5300 et seq.). The validity of premarital agreements signed before that date is "determined by the law applicable to the agreements prior to January 1, 1986." (Civ. Code, § 5203.)

approximately 33 cents), wife was not entitled to receive any of the agreed-upon sum unless the marriage was dissolved or husband died. The contract clearly provided for wife to profit by a divorce, and it cannot be enforced by a California court. (*In re Marriage of Higgason, supra,* 10 Cal.3d at p. 485.)

The rationale of *In re Marriage of Noghrey* (1985) 169 Cal.App.3d 326 [215 Cal.Rptr. 153] is particularly apt. There, a couple executed a "kethuba" in California before their marriage. The court explained the kethuba was "embedded in religious doctrine" and described it as "a marriage document which represents the obligation of the husband under the Jewish faith to, inter alia, provide for his wife upon divorcing her. Since the husband could apparently divorce his wife at will, the *kethuba* was a device created to provide economic security for the wife; but [it] was also intended to discourage divorce by making it costly and undesirable for the husband. The wife, on the other hand, was not as free to divorce and was subject to loss or reduction of her rights should she divorce her husband on certain grounds. [Citation.]" (*Id.,* at p. 329, fn. 2.) It mattered not that the kethuba originated in order to discourage divorce; the effect in that case was to encourage a dissolution by providing wife with cash and property in the event the marriage failed.

The result in this case is no different. Wife claims she was entitled to the dowry upon husband's death or dissolution of the marriage, no matter which party initiated that action. The provision pertaining to dissolution is before us, and it can only be viewed as encouraging "profiteering by divorce." (169 Cal.App.3d at p. 331.) It is of no moment that the court believed husband's expert on the issue; if the court had accepted the position of wife's expert, the contract would not have been enforceable under the public policy of this state.

Judgment affirmed. Respondent is entitled to costs.

Sonenshine, Acting P. J., and Wallin, J., concurred.