Opinion
 

 McDONALD, J.
 

 County of San Diego (County) appeals a summary judgment awarding Scripps Clinic and Research Foundation (Scripps) a refund of property taxes it paid to County. Scripps filed this action after County
 
 *405
 
 determined that a portion of Scripps’s property did not qualify for the property tax welfare exemption under Revenue and Taxation Code
 
 [1]
 
 section 214 (exemption). On appeal, County contends the court erred because as a matter of law a portion of Scripps’s property was used for the benefit of a private company through the more advantageous pursuit of that company’s business, thereby disqualifying the property for the exemption under section 214, subdivision (a)(4). We hold that use of property by its owner pursuant to a contract with another person negotiated in good faith at arm’s length, the consideration for which is not greater to the other person than fair market value, does not disqualify the property from the exemption under section 214, subdivision (a)(4). We affirm the judgment.
 

 Factual and Procedural Background
 
 [2]
 

 Scripps was incorporated as a nonprofit corporation in 1946.
 
 [3]
 
 In 1961 Scripps formed Research Institute of Scripps Clinic (RISC) as an unincorporated division to engage in basic scientific research.
 
 [4]
 
 “Basic” scientific research is the general inquiry into the laws of nature and natural phenomena. “Applied” research uses the results of basic research to develop specific products. RISC is generally precluded from engaging in applied research because of restrictions imposed by its funding relationship with the National Institutes of Health. Scripps therefore cannot independently develop marketable products which might be derived from its basic research; it is required to contract with private companies or other entities to perform applied research and produce products based on RISC’s basic research.
 
 [5]
 

 With the decline of government funding, RISC’s largest source of funding, Scripps searched for other sources of stable, long-term basic research funding. Scripps openly communicated with private industry to (1) encourage private industry to develop Scripps’s discoveries into useful products to cure or alleviate disease, and (2) seek contributions from private industry for
 
 *406
 
 basic scientific research. In 1981 and 1982 Scripps entered into agreements granting Johnson & Johnson (Johnson), a private company, licenses to develop and market applications of Scripps’s basic research. Effective January 1, 1987, these initial agreements were followed by two similar agreements between Scripps and Johnson, the effects of which are in question here. One agreement is titled “Research and License Agreement (Institutional)” (Institutional Agreement) and the other is titled “Research and License Agreement (Richard J. Lemer)” (Lemer Agreement).
 

 The Institutional Agreement generally provides that Johnson will contribute $4.5 million
 
 [6]
 
 annually to Scripps over a 10-year period to be used to fund Scripps’s basic research in exchange for options to obtain exclusive worldwide licenses to market and sell products that Johnson develops from Scripps’s basic research. When Scripps identifies a potentially marketable “research product,”
 
 [7]
 
 Johnson generally has a three-month option period during which it must exercise its option to obtain the license for that product. If Johnson does not timely exercise its option, Scripps may enter into a license agreement for that research product with another company. If Johnson exercises its option, it generally obtains a 20-year exclusive worldwide license. Under a license, Johnson generally must pay Scripps royalties of 5 to 7 percent of net sales of products developed from a Scripps research product.
 
 [8]
 
 If Johnson does not make reasonable efforts to develop a licensed research product, its license will terminate and Scripps may enter into a license agreement with another company.
 
 [9]
 
 Scripps at all times retains complete control over its research activities without any influence by Johnson, and Scripps retains ownership of all patents on its discoveries. Scripps further retains its right to publish the results of its research, including information about its products developed by Johnson. Scripps must deliver to Johnson quarterly reports on the status of research programs funded by Johnson.
 

 
 *407
 
 The Lemer Agreement generally contains the same terms and conditions as the Institutional Agreement, except that Johnson contributes $2,650,000 annually to Scripps for 10 years to be used for any research program under the direction of Dr. Richard Lerner. Scripps retains complete discretion to apply Johnson’s funding to any program under Dr. Lerner’s direction, and Johnson has no right to control the manner in which Dr. Lerner conducts his research.
 

 When County learned of the Institutional and Lemer Agreements, it obtained an opinion of staff counsel to the California State Board of Equalization (SBE) that a portion of Scripps’s property should not be exempt from tax because of the agreements with Johnson. SBE’s staff counsel concluded that, as a result of the agreements, Scripps’s property was used to benefit Johnson in the “more advantageous pursuit” of its business, which disqualified the property for the exemption under section 214, subdivision (a)(4). SBE partially denied Scripps’s exemption for the fiscal years 1987-1988 through 1989-1990, and Scripps paid all property taxes imposed for those years.
 

 On April 25, 1990, Scripps appealed the partial denial of the exemption to the full SBE board. After conducting evidentiary hearings, SBE overruled its staff’s decision and found Scripps was eligible for a full exemption for its property. However, under the authority of section 254.5, subdivision (b),
 
 [10]
 
 County denied Scripps’s request for a refund of $143,632 in aggregate property taxes paid for the fiscal years 1987-1988 through 1990-1991.
 
 [11]
 

 On January 21, 1993, Scripps filed this action against County for a refund of the property taxes it paid. The parties agreed to resolve the action by a summary judgment motion to be brought by Scripps on a joint stipulated statement of undisputed facts. The court granted Scripps’s motion for summary judgment, stating in its order:
 

 “As argued by County of San Diego, the central issue here is whether Scripps, in entering the subject contracts with [Johnson] in 1987 transgressed the requirement of [section 214, subdivision (a)(4)]. The court finds that Scripps did not. The Joint Record shows that Scripps did not conduct its research activities differently than it otherwise would with the introduction
 
 *408
 
 of funding from [Johnson]. [Citation.] Further, the contracts in issue expressly state that [Johnson] has no right to control [Scripps’s] research activities. [Citation.] [County] has submitted no evidence to refute that showing.
 

 “[County] relies on the argument that [RISC] operated for the more advantageous pursuit of [Johnson’s] business because it granted [Johnson] the benefit of its research in exchange for a mere $70 million. There is no indication that RISC has operated to provide [Johnson] with an advantageous financial return on that investment. The parties stipulated to the fact that [Johnson] has yielded approximately $1.4 million in sales related to the subject contracts. After six years, with an investment of $7 million per year by [Johnson], such a return does not indicate that RISC is operating for the more advantageous pursuit of [Johnson’s] business interests.
 

 “Assuming [Johnson] will yield a greater return in the future does not change the determination. [Johnson] and Scripps negotiated a deal which presumably took into account the risk that such an investment of funds might yield far more than the investment, or far less. The assertion that $700 million worth of research was purchased for $70 million fails to recognize that what cost $700 million may not be worth $700 million to private industry. The difference reflects the discounted risk factor reached by the parties. No evidence has been submitted to show that such a risk adjustment was inappropriate.”
 

 The court entered judgment for Scripps in the amount of $143,632 plus prejudgment interest. County appeals that judgment.
 

 Discussion
 

 I
 

 Standard of Review
 

 Because the facts are stipulated and undisputed, it is a question of law whether Scripps’s agreements with Johnson disqualify the property from the exemption, and we therefore apply an independent standard of review.
 
 (Pueblos Del Rio South
 
 v.
 
 City of San Diego
 
 (1989) 209 Cal.App.3d 893, 899 [257 Cal.Rptr. 578].)
 

 II
 

 Interpretation of Section 214, Subdivision (a)(4)
 

 Article XIII, section 4 (formerly § lc) of the California Constitution authorizes the Legislature to enact legislation to create certain property tax exemptions, stating in part:
 

 
 *409
 
 “The Legislature may exempt from property taxation in whole or in part:
 

 “(b) Property used exclusively for religious, hospital, or charitable purposes and owned or held in trust by corporations or other entities (1) that are organized and operating for those purposes, (2) that are nonprofit, and (3) no part of whose net earnings inures to the benefit of any private shareholder or individual.”
 

 In 1945, pursuant to this constitutional authority, the Legislature enacted section 214, which during the period in question stated in part:
 

 “(a) Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if:
 

 “(1) The owner is not organized and operated for profit; . . .
 

 “(2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual.
 

 “(3) The property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose. . . .
 

 “(4) The
 
 property is not used
 
 or operated by the owner or by any other person so as
 
 to benefit
 
 any officer, trustee, director, shareholder, member, employee, contributor, or bondholder of the owner or operator, or
 
 any
 
 other
 
 person, through
 
 the distribution of profits, payment of excessive charges or compensations or
 
 the more advantageous pursuit of their business
 
 or profession. . . .” (Italics added.)
 

 County concedes that Scripps meets all conditions for the exemption except the condition set forth in section 214, subdivision (a)(4). County contends that, as a result of the Institutional and Lemer Agreements, Scripps’s property is used to benefit Johnson through the “more advantageous pursuit” of Johnson’s business. (§ 214, subd. (a)(4).)
 

 In condensed form section 214, subdivision (a)(4) provides that to qualify for the exemption Scripps’s property must not be “used ... so as to benefit any . . . person[] through ... the more advantageous pursuit of [its] business.” The meaning of this statutory language is not self-evident. In interpreting statutory language, the following general principles apply: “ ‘Our function is to ascertain the intent of the Legislature so as to
 
 *410
 
 effectuate the purpose of the law. [Citation.] To ascertain such intent, courts turn first to the words of the statute itself [citation], and seek to give the words employed by the Legislature their usual and ordinary meaning. [Citation.] When interpreting statutory language, we may neither insert language which has been omitted nor ignore language which has been inserted. [Citation.] The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute [citation], and where possible the language should be read so as to conform to the spirit of the enactment. [Citation.]’ [Citation.] If the statute is ambiguous or uncertain, courts employ various rules of construction to assist in the interpretation. [Citation.] (3) Finally, ‘[t]he welfare exemption, like all tax exemption statutes, is to be strictly construed to the end that the exemption allowed is not extended beyond the plain meaning of the language employed. However, the rule of strict construction does not mean that the narrowest possible interpretation be given; “ ‘strict construction must still be a reasonable construction.’” [Citations.]’ [Citation.]”
 
 (Rideout Hospital Foundation, Inc.
 
 v.
 
 County of Yuba
 
 (1992) 8 Cal.App.4th 214, 219-220 [10 Cal.Rptr.2d 141].)
 

 To preclude the exemption, section 214, subdivision (a)(4) requires something more than a mere “benefit” to Johnson as a result of the agreements with Scripps; the benefit received by Johnson must be more advantageous. However, the statute does not directly identify the standard against which the term “more advantageous” is to be compared. It appears that the Legislature intended to preclude persons from obtaining an excessive benefit or a benefit better than a person might obtain through arm’s length negotiation—a benefit more favorable than fair market value. The other provisions of section 214, subdivision (a)(4) tend to support this interpretation, prohibiting insiders of charitable organizations and other persons from benefiting through “excessive charges or compensations.” The Legislature appears to have been concerned that persons might receive “excessive” advantages from a charitable organization. The word “excessive” is similar in meaning to the word “more” as used in section 214, subdivision (a)(4). We conclude that section 214, subdivision (a)(4) is intended to preclude the exemption to the extent property is used to benefit a person through excessive compensation or other excessive or above market advantage or consideration.
 

 Case law supports this interpretation of section 214, subdivision (a)(4). In
 
 Greek Theatre Assn.
 
 v.
 
 County of Los Angeles
 
 (1978) 76 Cal.App.3d 768, 783 [142 Cal.Rptr. 919], the County of Los Angeles contended that a charitable theater organization was not entitled to a welfare exemption for its property because: (1) patrons received preferential seating; (2) politicians and employees occasionally received complimentary tickets; and (3) professional
 
 *411
 
 performers received the benefits of having a place to perform and getting publicity for their appearances. The court rejected the contention that these “benefits” disqualified the property from the exemption under section 214, subdivision (a)(4). It reasoned:
 

 “The record is clear that patrons who contribute to the association, while receiving preferential seating, pay full price for their tickets. The preference cannot be construed as compensation. While employees of the association sometimes receive complimentary tickets, the record is also clear that they are not excessively compensated. It is only excessive compensation that triggers the condition. The record is also clear that the furnishing of complimentary tickets to local government officials is directly related to the receipt of government support and is not for the purpose of compensation to the officials.
 

 “True enough performers at the theaters receive the opportunity of advantageous pursuit of their profession. But the condition of subdivision (4) does not preclude that opportunity. The condition applies to bar the welfare exemption only when the private person is given a
 
 ‘more
 
 advantageous’ opportunity. Here the record is clear that the professional performers receive no more compensation or publicity than that which they customarily receive and sometimes receive less.”
 
 (Greek Theatre Assn.
 
 v.
 
 County of Los Angeles, supra,
 
 76 Cal.App.3d at p. 783, original italics.)
 

 Accordingly, the court held that the charitable theater was entitled to a section 214 welfare exemption. (76 Cal.App.3d at p. 784.)
 

 In
 
 Santa Catalina Island Conservancy
 
 v.
 
 County of Los Angeles
 
 (1981) 126 Cal.App.3d 221, 227, 232-233 [178 Cal.Rptr. 708], the County of Los Angeles and SBE denied a nonprofit conservancy’s welfare exemption because certain independent contractors received exclusive rights (1) to operate hunting programs, and (2) to conduct motor tours of the island in exchange for, respectively, (i) “tag fees” for certain animals and a percentage of hunting program revenues, and (ii) road use fees and a percentage of tour revenues. The court rejected the contention that these agreements with commercial establishments disqualified the property from the exemption under section 214, subdivision (a)(4). It stated: “Defendants argue that Doug Bombard Enterprises, through operation of the hunting program, and the Santa Catalina Island Company, through operation of the motor tours, used Conservancy property for the more advantageous pursuit of their businesses. Unfortunately, the argument ignores reality. Doug Bombard Enterprises had been engaged in operating hunting programs for approximately 20 years when the Conservancy became owner of the property in question; the
 
 *412
 
 evidence shows that hunting revenues steadily
 
 declined
 
 after the Conservancy assumed ownership. Surely this business enjoyed no more, and possibly less, advantageous a pursuit of this particular enterprise. Similarly, as the former owner of the subject property, the Santa Catalina Island Company had conducted motor tours for more than 40 years. Once the Conservancy assumed ownership, the Santa Catalina Island Company was obliged to pay road use fees and a portion of its tour revenues for the continued privilege of conducting the motor tours. This can hardly be termed a more advantageous pursuit of that particular business enterprise. The advantageous, or profitable, pursuit of one’s business is not what is prohibited; rather, it is only the
 
 more
 
 advantageous pursuit. (See
 
 Greek Theatre Assn.
 
 v.
 
 County of Los Angeles, supra,
 
 76 Cal.App.3d 768, 783.) Moreover, an organization’s realization of unintended profit does not affect its otherwise exempt status.
 
 (Id.
 
 at pp. 781-782.)”
 
 (Santa Catalina Island Conservancy, supra,
 
 at pp. 245-246, original italics.) Accordingly, the court held that the conservancy was entitled to a welfare exemption for its property.
 
 (Id.
 
 at p. 247.)
 

 III
 

 The Johnson Agreements Do Not Violate Section 214, Subdivision (a)(4)
 

 The Institutional and Lemer Agreements (sometimes together referred to as the Johnson agreements) do not result in the use of Scripps’s property for the benefit of Johnson through the more advantageous pursuit of Johnson’s business, because they do not provide to Johnson consideration above fair market value. County admits the Johnson agreements give Johnson options for exclusive worldwide licenses to develop, market and sell Scripps’s research products “in exchange for negotiated, fair-market, royalty payments.” County does not attack Scripps’s exemption on the ground that Johnson receives a benefit or advantage by paying Scripps below market royalties.
 

 County focuses on the nonmonetary factors of Scripps’s contractual relationship with Johnson. It asserts that Johnson’s options to obtain the “exclusive” worldwide licenses to Scripps’s research products for 20 years result in the use of Scripps’s property to benefit Johnson through the “more advantageous pursuit” of its business. However, County concedes that ordinary business agreements do not disqualify the property from the exemption under section 214, subdivision (a)(4). County does not argue that section 214, subdivision (a)(4) would be violated if, for example, Scripps entered into a five-year contract with a reputable private company to provide “exclusive” janitorial services for Scripps’s property at the current fair market rate for such services. Although the private janitorial company would
 
 *413
 
 “benefit” from Scripps’s property by receiving fair market payments for its exclusive services, the contract would not preclude the exemption under section 214, subdivision (a)(4). If the contract did preclude the exemption, all charitable organizations would be required to perform their own janitorial or other services or have volunteers perform them. Section 214 does not contemplate unreasonable limitations on the contractual relationships of charitable organizations as a condition to qualification for the exemption.
 

 Because of the 1980 amendment to federal law (35 U.S.C. § 200 et seq.) allowing basic research organizations like Scripps to patent their basic research products and license those products to private companies for development and marketing, we doubt that County would assert, and it has not asserted, that section 214 precludes Scripps from negotiating at arm’s length with many companies to grant an exclusive license to develop and market a single research product in exchange for fair market royalty payments. We see no reason to interpret section 214’s language to prohibit case-by-case negotiation and exclusive licensing of each of Scripps’s research products. Why then should section 214 preclude Scripps from negotiating a “package deal” in advance of its discoveries of research products? We find nothing in the language of section 214, subdivision (a)(4) partially to deny Scripps the exemption because of “package deals” like the Johnson agreements. If Scripps can enter into individual agreements for each of its research products and remain qualified for the section 214 exemption, it should be allowed to aggregate the rights to licenses for all of its prospective, yet currently unknown, research products to be discovered over a period of time, especially if it receives not only fair market royalty payments but also substantial research funding in the aggregate amount of $70 million over a 10-year period.
 

 County does not show how the grant of options for exclusive worldwide licenses of Scripps’s research products results in excessive or above market consideration or other advantage for Johnson. Scripps’s personnel stated during SBE hearings that Scripps’s arrangements with Johnson were not unusual, but in fact were typical and many other research entities had similar arrangements. Under the Johnson agreements, Scripps receives needed research funding “upfront” without waiting for a stream of future royalty payments to support its research. Seventy million dollars over a ten-year period is indisputably a substantial amount of funding. By combining that funding with Scripps’s additional receipt of future fair market royalty payments for all research products developed and marketed by Johnson pursuant to its licenses, Scripps does not receive less than fair market consideration for Johnson’s option rights. County does not show otherwise. Johnson did not receive
 
 excessive
 
 compensation, consideration or other advantage as a
 
 *414
 
 result of the Institutional and Lemer Agreements. County has not produced any evidence showing that the Institutional and Lemer Agreements contain any terms or conditions giving Johnson a benefit or advantage in excess of that which would result from arm’s length negotiations by Scripps with other companies.
 

 County argues that the Johnson agreements give Johnson exclusive options not only to research products resulting from its funding but also to research products developed from Scripps’s funding from other sources. However, we do not see how this results in a failure to satisfy the conditions of section 214. If Scripps entered into a licensing agreement with a private company at fair market value for the development and marketing of a single research product, resulting from public funding or from special funding by a private company, that agreement presumably would not result in disqualification of the section 214 exemption.
 

 Further, the possibility that the licensing rights to Scripps’s research products may ultimately be worth hundreds of millions of dollars in sales for Johnson does not disqualify Scripps from the exemption. As the trial court noted, the Johnson agreements effectively account for the commercial risks involved in developing and marketing Scripps’s research products. Although Scripps’s research products may ultimately be worth hundreds of millions of dollars on the market, it is also possible they may be worth far less than the $70 million in funding that Johnson contributes to Scripps over the 10-year period.
 
 [12]
 
 By entering into the Johnson agreements, Scripps effectively reduced the risk of the future marketable value of its research and also obtained immediate, substantial research funding. We do not conclude that to qualify for the exemption a charitable or scientific organization must undertake the substantial financial risk that its research may ultimately be worth little or nothing on the market.
 

 The cases cited by County in support of its contentions are inapposite. In both
 
 Alcoser
 
 v.
 
 County of San Diego
 
 (1980) 111 Cal.App.3d 907 [169 Cal.Rptr. 91] and
 
 California College of Mortuary Science
 
 v.
 
 County of Los Angeles
 
 (1972) 23 Cal.App.3d 702 [100 Cal.Rptr. 558], the courts held that specific vocational education organizations were not entitled to section 214
 
 *415
 
 exemptions because they did not benefit the community as a whole. County does not contend that Scripps’s research does not benefit the community as a whole; in fact, it concedes that all of Scripps’s research, including research undertaken with Johnson’s funding, serves valid charitable and scientific purposes. We conclude
 
 Greek Theatre
 
 is more analogous. In that case, patrons received preferential seating in addition to paying full price for their tickets.
 
 (Greek Theatre Assn.
 
 v.
 
 County of Los Angeles, supra, 16
 
 Cal.App.3d at p. 783.) Here Johnson received preferential or exclusive options for research product licenses by paying $70 million in advance of any benefit in addition to paying fair market royalties. Section 214, subdivision (a)(4) does not prohibit either arrangement.
 

 The Johnson agreements do not divest Scripps of its control over its property or research activities. Scripps retains the right to publish all of its research findings, including those resulting from research funded by Johnson. Further, County concedes that Scripps’s research and other activities continue to constitute valid charitable and scientific operations even under the Johnson agreements, and Scripps would be entitled to the welfare exemption for its property absent the provisions of section 214, subdivision (a)(4). Because we conclude the Johnson agreements are the result of good faith arm’s length negotiations and the consideration to Johnson is not above fair market value, the Johnson agreements do not benefit Johnson through the more advantageous pursuit of its business under section 214, subdivision (a)(4), and Scripps is therefore entitled to a full welfare exemption for its property.
 
 [13]
 

 Disposition
 

 The judgment is affirmed.
 

 Huffman, Acting P. J., and Jones, J.,
 
 *
 
 concurred.
 

 [1]
 

 All statutory references are to the Revenue and Taxation Code.
 

 [2]
 

 Our factual summary reflects the undisputed facts set forth in the joint stipulated statement of facts filed by the parties and on which the trial court relied in deciding Scripps’s summary judgment motion.
 

 [3]
 

 During the tax years in question, Scripps was organized and operated exclusively for hospital and scientific purposes, uses which qualify Scripps’s property for the exemption.
 

 [4]
 

 During the years in question, RISC had five basic research departments: molecular and experimental medicine, immunology, molecular biology, chemistry and neuropharmacology.
 

 [5]
 

 Scripps was also hindered from developing applied research products by its inability to obtain patents for its basic research products until 1980 when the federal patent law (35 U.S.C. § 200 et seq.) was amended to allow and encourage basic research organizations to patent their basic research products and enter into agreements similar to the agreements in question in this case.
 

 [6]
 

 Of this $4.5 million annual amount, Scripps may use $3 million for the direct or indirect costs of any of its biomedical research programs, while the other $1.5 million is to be applied to the costs of specific research programs suggested by Scripps and approved by Johnson.
 

 [7]
 

 The parties stipulated: A “research product” is defined as “medical technology upon which significant research work has commenced and as to which Scripps has identified potential commercial feasibility to [Johnson], but which has not yet been developed to readiness for regulatory registration and/or pre-market governmental approval.”
 

 [8]
 

 County has stipulated that the royalties Scripps is to receive from Johnson are negotiated, fair market royalty payments.
 

 [9]
 

 Johnson is also obligated to deliver to Scripps semiannual reports on the status of Johnson’s research and development of licensed research products. If Johnson does not deliver these reports to Scripps within 30 days after written notice that the semiannual reports are due, its license terminates and Scripps may enter into a license agreement with another company.
 

 [10]
 

 Section 254.5, subdivision (b) states in part: “The assessor [e.g., County] may deny the claim of an applicant [e.g., Scripps] the board [i.e., SBE] finds eligible but may not grant the claim of an applicant the board finds ineligible.”
 

 [11]
 

 The aggregate amount of taxes imposed by County over the four-year period on approximately 4 percent of Scripps’s property is $143,632, representing approximately $2 million of Scripps’s total property valued at approximately $58 million.
 

 [12]
 

 The parties stipulated that as of October 14, 1993, Johnson received net sales of approximately $1.4 million from research products licensed to it by Scripps under the Institutional and Lemer Agreements. By comparison, Johnson had contributed approximately $42 million to Scripps over the six years of the agreements. This substantial disparity between the amount Johnson paid to Scripps and the amount Johnson received in sales shows Johnson was not even close to recovering the funding it gave Scripps and that Johnson clearly assumed a substantial risk under the agreements whether it would ultimately profit from the arrangement or whether it would even recoup its payments to Scripps.
 

 [13]
 

 Our disposition of County’s appeal on this basis makes it unnecessary to consider Scripps’s argument that its property was not actually “used” to benefit Johnson in violation of section 214, subdivision (a)(4). (See, e.g.,
 
 Clubs of Cal. for Fair Competition
 
 v.
 
 Kroger
 
 (1992) 7 Cal.App.4th 709 [9 Cal.Rptr.2d 247].)
 

 *
 

 Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.