[No. B156153. Second Dist., Div. Six. Jan. 21, 2003.]

In re the Marriage of DONNA J. and ALBERT R. BELLIO,
DONNA J. BELLIO, Appellant, v.
ALBERT R. BELLIO, Respondent.

**COUNSEL**

Orrock, Higson & Kurta and R. Dennis Orrock for Appellant.

Clarizio, Goldfarb & Rosemblat and Archie Clarizio for Respondent.

**OPINION**

**YEGAN, J.**—Donna J. Bellio (wife) appeals from the judgment dissolving her marriage to Albert R. Bellio (husband). Wife contends that the trial court erroneously refused to enforce a premarital agreement requiring husband to pay her $100,000 upon a divorce. We agree and reverse.

*Facts and Procedural History*

The parties were married in September 1997. Husband, who was 71 years old, was a multimillionaire. Wife, who was 48 years old, had a net worth of about $60,000 and was earning approximately $12 per hour. She was receiving monthly spousal support of $933 from a former spouse. The prior marriage had lasted 24 years.

In August 1997 husband asked wife to sign a premarital agreement (hereafter agreement). It provided that the parties' separate property would remain separate property and that earnings and accumulations during the marriage would be held as separate property.

Wife concluded that, under the agreement proposed by husband, she "couldn't afford to marry [him]." Wife believed she would be in a "precarious" economic position if "the marriage didn't work" or if husband died. The support from her former spouse would terminate if she remarried, and "she could barely make ends meet with . . . her earnings . . . ." To compensate for the loss of support from her former spouse, wife insisted that the agreement be modified to provide that, if "the marriage terminates due to divorce or death of [husband], [husband] (or his estate or trustee if he is deceased) will pay to [wife] . . . the sum of $100,000."

Wife's attorney told husband that, if wife did not remarry, she would probably receive support from her former spouse "for the rest of her life" because the prior marriage was of long duration and her former spouse "was in his early 50's."

The agreement was modified to include the $100,000 payment provision demanded by wife. Both parties signed the modified agreement. Each was represented by independent counsel. Husband testified that he had signed the agreement "freely and voluntarily." The trial court found: "[T]here is no genuine dispute that the parties executed the agreement capably, knowingly, voluntarily, and with the benefit of independent counsel."

The parties separated in November 1998. The following month, wife petitioned to dissolve the marriage. She sought to enforce the $100,000 payment provision.

The trial court concluded that the provision was unenforceable because it "unquestionably encourage[d] its beneficiary, Wife, to seek a dissolution" and therefore violated public policy. On the other hand, the court found that the $100,000 payment provision was " 'reasonable to the circumstances of the parties' . . . ." The court stated: "[I]ts main purposes and objectives were to insulate Husband's accumulated assets and to provide Wife with a necessary level of immediate financial security upon the termination of the marriage . . . . But for 'the public policy limitation', . . . those purposes and objectives are neither inappropriate nor illicit."

## Discussion

The trial court relied on the rule that public policy renders a premarital agreement void insofar as its terms encourage or promote the

dissolution of the marriage. This rule was reaffirmed by our Supreme Court in *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 346, 349-350 [131 Cal.Rptr. 3, 551 P.2d 323].[1] Our Supreme Court reasoned that terms which encourage or promote dissolution "offend[] the public policy to foster and protect marriage." (*Dawley*, at p. 350, fn. 5.) On the other hand, "[n]either the reordering of property rights to fit the needs and desires of the couple, nor realistic planning that takes account of the possibility of dissolution, offends the public policy favoring and protecting marriage. It is only when the terms of an agreement go further—when they promote and encourage dissolution, and thereby threaten to induce the destruction of a marriage that might otherwise endure—that such terms offend public policy." (*Id.*, at p. 358; accord, *In re Marriage of Pendelton & Fireman* (2000) 24 Cal.4th 39, 51-52 [99 Cal.Rptr.2d 278, 5 P.3d 839].)

The trial court believed it was bound by two cases that had applied the *Dawley* rule to void premarital agreements requiring one spouse to give the other money or property upon a divorce. The cases are *In re Marriage of Noghrey* (1985) 169 Cal.App.3d 326 [215 Cal.Rptr. 153], and *In re Marriage of Dajani* (1988) 204 Cal.App.3d 1387 [251 Cal.Rptr. 871].

In *Noghrey* the premarital agreement required the husband to give the wife his house " 'and $500,000, or one-half [his] assets, whichever is greater, in the event of a divorce.' " (*In re Marriage of Noghrey, supra,* 169 Cal.App.3d at p. 329.) The appellate court held that the agreement was against public policy and therefore unenforceable because it encouraged the wife "to seek a dissolution, and with all deliberate speed, lest the husband suffer an untimely demise, nullifying the contract, and the wife's right to the money and property." (*Id.*, at p. 331.)

In *Dajani* the parties were married by proxy in Jordan. Before the marriage, the husband agreed to pay the wife a dowry of 3,000 Jordanian dinars plus an additional 2,000 dinars in cash or household furniture. The dowry would become due only upon the dissolution of the marriage or the husband's death. The wife petitioned for dissolution. At the time of trial, the dowry's value in American dollars was approximately $1,700. (*In re Marriage of Dajani, supra,* 204 Cal.App.3d at p. 1388, fn. 3.) The appellate court

---

[1]*Dawley* was decided before the adoption of the California Uniform Premarital Agreement Act. (Fam. Code, §§ 1600-1617.) The act became effective on January 1, 1986, "and applies to any premarital agreement executed on or after that date." (*Id.*, § 1601.) The act provides that permissible subjects of a premarital agreement include "[t]he disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event," and "[a]ny other matter . . . not in violation of public policy or a statute imposing a criminal penalty." (*Id.*, § 1612, subd. (a)(3) & (7).) Because we conclude that the *Dawley* rule does not preclude the enforcement of the parties' agreement, we need not consider the effect, if any, of the act upon that rule.

held that the dowry agreement was unenforceable because "it can only be viewed as encouraging 'profiteering by divorce.' [Citation.]" (*Id.*, at p. 1390.) The court reasoned that, as in *Noghrey*, "the effect . . . was to encourage a dissolution by providing wife with cash and property in the event the marriage failed." (*Ibid.*)

We agree with the rationale of *Noghrey*. The property involved in that case—the husband's house and the greater of $500,000 or one-half of his assets—was so substantial that the premarital agreement "threaten[ed] to induce the destruction of a marriage that might otherwise endure . . . ." (*In re Marriage of Dawley, supra,* 17 Cal.3d at p. 358.) On the other hand, we believe that *Dajani* was wrongly decided. A dowry worth only $1,700, payable upon dissolution, is insufficient to seriously jeopardize a viable marriage.

The issue here is whether the trial court correctly applied the *Dawley* rule to void the agreement's $100,000 payment provision. ■ Since the material facts are undisputed, the issue is one of law. (*Scripps Clinic & Research Foundation v. County of San Diego* (1997) 53 Cal.App.4th 402, 408 [61 Cal.Rptr.2d 756].) "[W]e therefore apply an independent standard of review. [Citation.]" (*Ibid.*)

■ Unlike *Noghrey*, the $100,000 payment provision did not threaten the marriage relationship. The provision was the product of "realistic planning that takes account of the possibility of dissolution . . . ." (*In re Marriage of Dawley, supra,* 17 Cal.3d at p. 358.) It effected a permissible "reordering of property rights to fit the needs and desires of the couple . . . ." (*Ibid.*)

Wife's need for the $100,000 payment provision arose from her dependence upon the monthly support of $933 from her former spouse. If she remarried, the spousal support would terminate. The trial court found that the provision was intended to compensate wife for the loss of this support: "At the time the agreement was negotiated, it was understood by both parties . . . that the $100,000 amount . . . was loosely calculated upon the potential amount of spousal support forfeited by Wife upon the occurrence of this marriage." Neither party has challenged this factual finding.

Thus, the purpose of the $100,000 payment provision was to ensure that, if husband died or the marriage was dissolved, wife would be no worse off than she would have been had she remained single. Such a provision cannot reasonably be construed as "threaten[ing] to induce the destruction of a marriage that might otherwise endure . . . ." (*In re Marriage of Dawley,*

*supra,* 17 Cal.3d at p. 358.) Rather, the provision made it economically feasible for wife to enter into the marriage.

Our Supreme Court has recognized that "today the availability of an enforceable premarital agreement 'may in fact encourage rather than discourage marriage.'" (*In re Marriage of Pendelton & Fireman,, supra,* 24 Cal.4th at p. 53.) The $100,000 payment provision had this very effect. It does not offend the public policy favoring and protecting marriage.

## *Disposition*

The judgment is reversed. The matter is remanded to the trial court with directions to enforce the premarital agreement. Wife shall recover her costs on appeal.

Gilbert, P. J., and Perren, J., concurred.